**Holmes HARDEN, Plaintiff,**

**v.**

**WARNER AMEX CABLE COMMUNICATIONS INC., Defendant.**

**No. 83 Civ. 9159 (PKL).**

United States District Court, S.D. New York.

Sept. 3, 1986.

Arnheim, Lehman & Gikow, New York City, for plaintiff; Arthur R. Lehman, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendant; Stephen A. Weiner, Thomas F. Clauss, Jr., of counsel.

## OPINION

LEISURE, District Judge:

Plaintiff, Holmes Harden, a former Executive Vice President and Chief Financial Officer of defendant Warner Amex Cable Communications, Inc. ("Warner Amex"), seeks damages on the basis of defendant's alleged breach of an employment agreement dated January 27, 1981 ("Agreement"). Jurisdiction has been invoked on the basis of diversity of citizenship. Plaintiff contends that under his employment contract with defendant and upon termination of his employment, he was entitled to receive the following: (a) pension benefits; (b) a bonus payment of $63,000 for services rendered in 1980; (c) nine months' salary following termination; (d) ten weeks accrued vacation pay; and (e) nine months' life and accidental death insurance and medical insurance coverage. Plaintiff has also asserted that he is entitled to an accrued bonus payment pro rated for the portion of 1983 that he was employed at Warner Amex.

Before trial, the $63,000 bonus dispute was resolved by agreement between the parties. Also, defendant withdrew an affirmative defense that plaintiff had misused certain confidential information. Finally, on the eve of trial, the parties waived their right to a jury trial. Consequently, this case was tried to the Court without a jury from October 28, 1985 through November 4, 1985. The following shall constitute the Court's Findings of Fact and Conclusions of Law under Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

*The Parties*

Harden is a citizen of the State of Connecticut. Warner Amex is an Illinois cor-

poration, with its principal place of business in New York, New York. It is engaged in the cable television business.

Harden was employed as Executive Vice President and Chief Financial Officer of Warner Amex from March 1, 1981 until August 26, 1983, and was paid through the end of August 1983.

Warner Amex was owned equally by Warner Communications Inc. ("Warner") and American Express Company ("American Express"). Warner Amex was managed by an Executive Committee which consisted of Warner Amex senior management representatives and representatives of the parent companies, including Lou Gerstner, Sandra Meyer and Bob Smith of American Express and from Warner Communications, Bert W. Wasserman, Chief Financial Officer, and David Horowitz. In 1981, George Sheinberg replaced Smith as Treasurer of American Express and became a member of the Executive Committee. The Executive Committee was responsible for a range of business issues, including monitoring the general status of the cable television industry, the operations and programming aspects of the business, and the results of operations. In addition, the Executive Committee reviews issues dealing with employment and senior management.

*Harden's Prior Employment And Compensation*

Before joining Warner Amex, plaintiff worked for Reliance Insurance Company ("Reliance") as Senior Vice President and Chief Financial Officer. In that position, plaintiff supervised several hundred persons, and reported to the Reliance President and Chief Executive Officer. His other responsibilities included financial record keeping and reporting, supervision of data processing systems, mergers and acquisitions, banking relationships, and preparation of tax returns and reports to the Securities and Exchange Commission.

Reliance paid plaintiff an annual salary of $103,000 when he left. In addition to this base salary, plaintiff was entitled to a bonus equal to 70% of his annual salary.

This percentage was expected to increase to 100% of his salary the next year. Reliance also provided Harden with non-qualified stock options, life insurance benefits in excess of $800,000, and travel accident benefits in the amount of $400,000. In addition to being within one year of vesting in two Reliance pension plans, plaintiff also enjoyed substantial medical benefits. At the time he left Reliance, plaintiff was also entitled to five weeks of vacation per year after the completion of ten years of service. In addition, it was Reliance's policy to permit the accumulation of unused vacation time payable upon the departure of any executive employee at his then current salary. When plaintiff left Reliance, he was compensated for such accumulated but unused vacation pay.

When Harden first considered leaving Reliance to join Warner Amex, he was within ten months of completing the ten years of Reliance service necessary for him to vest in the Reliance Group Incorporated pension plan and the Reliance Insurance Company pension plan. Notwithstanding this situation, plaintiff was interested when, in the summer of 1980, an executive recruiting firm suggested to plaintiff the prospect of an employment opportunity with defendant.

*The Agreement*

Warner Amex employed Harden pursuant to an agreement dated January 27, 1981 (the "Agreement") signed by Harden and John D. Lockton, Jr., who, at the time, was President and Chief Operating Officer of Warner Amex. The Agreement was the product of negotiations and discussions between Harden and Lockton and Nickolas Davatzes, the Warner Amex Senior Vice President, Human Resources Administration. During the course of these negotiations, Harden represented himself, although Elliot Wohl, a lawyer employed by Reliance, provided Harden with informal advice concerning at least one of the Agreement's drafts.

The Agreement, as signed, provides in relevant part, as follows:

2. *Compensation*—Base salary: $125,-000 on an annualized basis for 1981 (to be adjusted for start date), plus an expected annual bonus of $65,000 for 1981 payable in early 1982. It is assumed that base and bonus will increase in future years, dependent upon both your own performance and the company's performance.

\* \* \* \* \* \*

4. *Pension*—If you voluntarily terminate your employment with the company, pension benefits will be determined as follows:

a. Voluntary termination within five years of employment—no benefits paid.

b. Voluntary termination after five years of employment—the company agrees to pay you, commencing on your 65th birthday, an amount which would be equal to that which you would have received under its qualified pension plan had you commenced employment with the company on August 1, 1971. Any payments received under this paragraph will be reduced by any amounts received by you, if any, under the company's qualified pension plan.

If for any reason, other than cause, your employment is terminated by the company prior to full vesting under its qualified pension plan, the company agrees to pay you, commencing on your 65th birthday, an amount which would be equal to that which you would have received under its qualified pension plan had you been fully vested as of the date of involuntary termination with the number of years of service as of that date needed for full vesting (currently 15 years). Any payments received under this paragraph will be reduced by any amounts received by you, if any, under the company's qualified pension plan.

If you are terminated by the company at any time for cause, any and all pension benefits you would be entitled to would be paid only from the company's qualified pension plan and only to the extent you may be vested therein.

For purposes of the calculation of any benefits due under the terms of this letter, in the event you do not complete five years of employment, for purposes of determining the final average pay over a five-year period, it shall be assumed that for every year short of five years of employment you would have earned the sum of $125,000 per year.

Benefits payable hereunder shall be determined on the basis of a single life annuity. You will have the right to elect any appropriate joint and survivor election permissible under the company's qualified plan with the same actuarial assumptions as would be applicable under said plan.

\* \* \* \* \* \*

6. *Termination*—If for any reason, other than cause, your employment is terminated by the company within five years of employment, the company will continue obligated to pay your then monthly salary (but not bonus) for a period of up to nine months or until you commence alternative employment, whichever shall first occur.

\* \* \* \* \* \*

8. *Other Benefits*—All other Warner Amex benefits will be provided to you in accordance with their terms.

*Preliminary Negotiations*

Initially, Harden met with Gustave Hauser, the Chief Executive Officer of Warner Amex in September 1980. They discussed Warner Amex's business and the duties and responsibilities for the positions of President and Chief Financial Officer, respectively. Following this meeting, Lockton was hired by Warner Amex as President and Chief Operating Officer. Harden remained a candidate for the position of Executive Vice President and Chief Financial Officer. During further discussions, Hauser told Harden that Warner Amex needed to raise funds for Warner Amex's committed construction program. These financings were to be the responsibility of the Chief Financial Officer.

In late November or early December 1980, Harden met with Lockton. Lockton described the duties and responsibilities of the Warner Amex Chief Financial Officer to include fund raising for the construction of cable franchises and dealing with Warner Amex's lending commercial banks.

When Harden became the leading candidate for the job of Chief Financial Officer, Lockton and the other members of the Warner Amex senior management wanted plaintiff to join Warner Amex as soon as possible. In response, Harden described to Lockton in detail Harden's total compensation and benefit package at Reliance. Harden told Lockton that he was unwilling to sacrifice any portion of the compensation or other benefits which he had at Reliance, with the exception of the Reliance stock options. These discussions also covered severance compensation in the event Harden left Warner Amex and how Warner Amex would replace the pension benefits which plaintiff had accrued during his nearly ten years at Reliance.

In early January, 1981, Warner Amex offered plaintiff the position of Executive Vice President and Chief Financial Officer. Harden and Davatzes then began discussions about Harden's compensation package. Harden told Davatzes that he was unwilling to forfeit his Reliance pension credit and would not accept the offer unless the company guaranteed him identical retirement benefits based upon the assumption that plaintiff had fully vested in the Reliance plans. Lockton testified that the purpose of the Agreement which resulted from these discussions was to persuade Harden to work for Warner Amex. Lockton stated that he and the others "were very interested in getting him in here, giving him pension benefits which made him comfortable based on what he had been offered at Reliance Insurance."

According to Davatzes, they discussed how a termination would affect the context of pension and severance benefits. Specifically, they agreed that Harden would not receive a pension in the event there was a voluntary termination within five years of employment. On the other hand, it was agreed that a mutually acceptable termination in which plaintiff and Warner Amex "agreed to disagree" would not cause a forfeiture of plaintiff's pension rights. According to Davatzes, he opposed making plaintiff whole with respect to Harden's pension rights, and suggested to Lockton that plaintiff's employment date should be postponed until Harden had vested in the Reliance plans. But, because Lockton wanted plaintiff to begin with Warner Amex immediately, he directed Davatzes to provide plaintiff with pension benefits equal to those he had earned at Reliance. The end result of the discussions concerning plaintiff's pension benefits, according to Davatzes, was that Harden "would be made whole." In other words, there was a "gentlemen's understanding" that if either party decided that it was not working out, Harden "would still be made whole."

With respect to severance benefits, plaintiff told Lockton that at Reliance, in the event plaintiff decided to leave for any reason, he could simply inform the company and Reliance would continue to compensate plaintiff for a minimum of one year. It was the Warner Amex policy, on the other hand, that in the event an employee unilaterally resigned to take another job, Warner Amex did not make severance payments. According to Lockton, however, on one occasion, when a mutually acceptable resignation, or a "being-pushed-out sort of resignation," occurred, severance payments were made. Davatzes testified that the concept of a "mutually acceptable" termination applied to severance pay. This concept included the possibility of an agreement to disagree or a determination by plaintiff and Warner Amex that the employment situation was not fruitful or satisfactory to either party. According to Davatzes, plaintiff could have left Warner Amex because they did not like the way they "sailed together," and Warner would have been obligated to pay plaintiff all benefits due upon a termination of plaintiff's employment by the company. This was consistent with Warner Amex's Human Resources Policy Manual, which pro-

vides, with respect to separation, that all full-time employees are eligible for severance pay in the event they are separated on the basis of a "mutually satisfactory resignation."

Lockton told plaintiff that in the event Harden decided to leave Warner Amex, and the company disagreed with such departure, Lockton wanted to have the discretion to examine the circumstances under which Harden was leaving so that Lockton could decide unilaterally if Harden should be compensated by receipt of severance benefits. Lockton also told plaintiff that he did not want to anticipate all the circumstances which could lead Lockton to decide not to compensate Harden in the event of a voluntary termination.

Plaintiff claims that he and Lockton agreed that if plaintiff left Warner Amex for any reason other than fraud or similar circumstances, he would be entitled to receive severance pay at his then existing salary and a continuation of his fringe benefits for a minimum of nine months or until he found a new position, whichever occurred earlier. Paragraph 6 of the Agreement provides, however, that plaintiff shall be entitled to receive severance benefits only if his employment is terminated "by the company" for any reason, other than for cause. Lockton recalls no discussion with Harden concerning paragraph 6 of the Agreement, including any discussion with respect to the inclusion of the words "by the company" in the second line of paragraph 6. Harden never asked Lockton to delete the words "by the company," nor did he complain to Lockton about the language and never asked that any changes be made in paragraph 6. Harden stated at trial that he would have preferred that these words not be included.

Neither Lockton nor Davatzes recalls any discussion with Harden concerning vacation benefits at the time the Agreement was being negotiated. According to Harden, Lockton did not object if Harden could manage his department in such a manner that he could afford to take off five weeks every year, but there was no discussion about vacation carryovers or pay in lieu of untaken vacation.

Paragraph 2 of the Agreement describes plaintiff's compensation in the form of salary and bonus. It provides that plaintiff's 1981 base salary would be $125,000

> plus an expected annual bonus of $65,000 for 1981 payable in early 1982. It is assumed that base and bonus will increase in future years, dependent upon both your own performance and the company's performance.

Plaintiff's compensation history at Warner Amex was consistent with the terms of the Agreement. In 1983, plaintiff received a bonus for 1982 in the amount of $100,000, and a $15,000 raise in base salary. Plaintiff received a $15,000 base salary increase for 1983.

Davatzes and Hauser told plaintiff that the bonus would be a part of his annual compensation and that it was normal practice to pay bonuses to senior officers at the end of the calendar year. The company also had a practice of paying bonuses to individuals who were in the process of leaving the company. According to paragraph 6 of the Agreement, it was agreed that a bonus would not accrue during the term of the salary continuation following plaintiff's termination by the company. Conversely, plaintiff was entitled to receive a bonus for the time that he worked at Warner Amex in the event his employment ended. Plaintiff conceded, on the other hand, that there was no guarantee that a bonus would be paid every year, but he was told that only dire circumstances would interfere with payment of a bonus.

There is no evidence in the record that Warner Amex paid bonuses to members of the management group for 1983. However, Andrew L. ("Drew") Lewis, Jr., successor to Lockton, testified that he was "totally satisfied with [Harden's] performance." Pursuant to paragraph 4, the performance of plaintiff and the company related not to whether a bonus would be paid but only to whether the bonus would increase in future years.

After these negotiations were concluded, the Warner Amex Human Resources Department, under Davatzes' supervision, prepared the Agreement, dated January 27, 1981, which outlined certain of the terms and conditions of plaintiff's employment. Harden read the Agreement and all of its provisions before he signed it. He signed it even though the Agreement in its final form was not satisfactory to him in all respects.

The Agreement does not contain a merger clause. According to Davatzes, the Agreement "is not a clear letter and that much of what went on was between the men involved," meaning Harden and Lockton. For example, the Agreement provides that the pension benefits payable shall be determined on the basis of a single life annuity, but is silent as to whether the single life annuity was to be determined on a straight life basis or a straight life with ten year certain payment. Alan W. Wolff, the Warner Amex Corporate Director of Pensions, testified that the section describing plaintiff's pension benefits is vague and ambiguous as to whether the pension guarantee was to be on a life annuity or a ten year certain and life basis. Plaintiff's pension benefits at Reliance were computed on a ten year certain basis. Plaintiff and Warner Amex agreed that, under appropriate circumstances, plaintiff would be made whole with respect to his Reliance pension benefits. The Agreement also incorporated by reference all benefits provided by Warner Amex to its other employees.

The Agreement does not define the terms "voluntary termination," "termination by the company," or "cause." Harden and Davatzes had agreed that "voluntary termination" as it appears in paragraph 4 did not include a mutually acceptable termination, or an agreement to disagree. Thus, the term "voluntary termination" applies to a situation where Harden would leave of his own accord without the company's consent or acquiescence. The phrase "terminated by the company" is ambiguous, since the Agreement does not define what constitutes a termination by the company for reasons other than cause. According to plaintiff, it was agreed that a mutually acceptable termination constituted a termination by the company for a reason other than cause that would entitle plaintiff to receive the pension and other benefits set forth in the Agreement.

The Agreement is silent as to plaintiff's rights to continued compensation in the event that plaintiff voluntarily resigns. Consistent with the concept of mutually acceptable termination, in the event that the parties together or the company alone determined that the continued employment relationship was unsatisfactory, plaintiff would be compensated by being carried as an employee on the payroll for a period of up to nine months from the date of his departure. In such case, he would continue to receive all other benefits he received while he was employed by the company. The only specific limitation on the salary continuation was that he would not be entitled to a bonus for the time that he was not actually employed by the company.

*Harden's Duties And Authority*

Harden performed the duties of Executive Vice President and Chief Financial Officer of Warner Amex from March 1981 through August 26, 1983. He reported directly to Lockton and Hauser with respect to cable operations and to Jack Schneider, President of Warner Amex Satellite and Entertainment Company ("WASEC"), with respect to satellite operations. Harden reported also to the senior financial personnel in the parent companies, including Bert Wasserman, Chief Financial Officer of Warner Communications, and Bob Smith, Treasurer of American Express.

Harden's duties included responsibility for the books and records of the company; reporting to management on the results of operations; preparing federal and local income tax returns; supervising data processing, information systems and treasury activities; handling bank relationships; and the filing of certain financial information and schedules related to franchising activities. Harden had the authority to make employment decisions for his department.

He hired one person whom he knew before he joined Warner Amex. Recommendations that he made from time to time for the addition of employees to the staff were accepted.

Plaintiff attended Executive Committee meetings until early 1983, where he supplied detailed financial reports. In addition, plaintiff reported to the Warner Amex Audit Committee, which officially was composed of one member from each parent company. The Audit Committee reviewed financial activities on the part of Warner Amex.

*Interest Rate Negotiations*

At the time plaintiff arrived at Warner Amex, the company had a $250,000,000 revolving line of credit with a group of commercial banks. The "revolver" interest rate was equal to $117\frac{1}{2}\%$ of the prime rate. This arrangement had been negotiated by Bert Wasserman, the Warner Chief Financial Officer. From April 1981 through July 1, 1981, Harden and Smith were in charge of the negotiations by which Warner Amex reduced its borrowing rate under the revolver to 50 to 75 basis points below the prime lending rate.

*Tax Benefit Transfers*

The Warner Amex finance and tax departments, working under Harden's supervision, generated a proposal for and implemented certain tax benefit transfers in 1981 which resulted in tax savings to Warner Amex of about $18,000,000 in 1981 and 1982.

*Financial Forecasts*

One of plaintiff's responsibilities included financial analysis functions, including the preparation of financial projections both for submission of franchise bids and for internal use by management and the parent companies. The financial forecasts were based on assumptions about the particular markets.

Using assumptions supplied by the WA-SEC senior management, in August 1981, plaintiff completed preparations of an eleven-year forecast for Warner Amex. Later in 1981, plaintiff developed a new set of forecasts since the results of operations were worse than had been predicted by the August, 1981 forecast. Pursuant to a request from senior management, plaintiff caused a forecast dated January 8, 1982 to be published. For comparison purposes, the August, 1981 forecast was included. The January forecast was recalled by Warner Amex senior management, which ordered removal of any reference to the August 1981 forecast and republication of the forecast without reference to the earlier forecasts.

At a June, 1982 Warner Amex Executive Committee meeting, Harden was told to send the revised January 1982, forecast to Warner Amex's bankers. Plaintiff refused contending that it was based on unrealistic assumptions and it was not suitable for outside purposes. Without the historical comparison to the August 1981 forecast, plaintiff asserted that it would damage the company's credibility with its lending banks and its financial position. In August 1982, plaintiff prepared a forecast based on more realistic assumptions to be submitted to the company's bankers. A member of the Warner Communications Executive Committee, David Horowitz, informed plaintiff that "great damage" had been done to Warner Amex by providing the bankers with a more conservative projection than was presented in the January 1982 forecast.

*Relations With Parent Company Representatives*

In late 1982, Alva Way, President of American Express, Chairman of the Warner Amex Audit Committee and a member of the Warner Amex Board of Directors, told plaintiff that George Sheinberg, Treasurer of American Express and a member of the Warner Amex Executive Committee, was displeased with plaintiff's performance. Sheinberg criticized plaintiff's attendance at the American Bankers Association convention held in Atlanta, Georgia, which caused him to miss important meetings that were being held in New York among the operational heads of Warner Amex. Sheinberg felt that this reflected

on plaintiff's competence. He expressed his displeasure to members of the Executive Committee and to plaintiff. Sheinberg openly criticized plaintiff and told the members of the Executive Committee that plaintiff was incompetent.

Harden claims that Sheinberg was confrontational and rude with him and that Sheinberg often indicated that he preferred not to deal with plaintiff. During a Warner Amex Executive Committee meeting held in November 1982, Sheinberg screamed at plaintiff with regard to an aspect of the $800,000,000 revolving credit arrangement. Sheinberg's voice became so loud that he interrupted the meeting taking place inside the adjacent conference room.

Bert Wasserman also voiced complaints about plaintiff to American Express representatives, Hauser, Drew Lewis, Lockton's successor, plaintiff and Fred Tepperman, the Warner Chief Financial Officer in 1983. Wasserman also stated that plaintiff lacked involvement in the day-to-day reporting of financial information to the parent companies. It appeared to him that plaintiff preferred to concentrate on matters of financing for Warner Amex that were more the responsibility of the two co-owners. Wasserman was also concerned that plaintiff was not attentive to keeping the Warner Amex accounts receivable current.

### Staff Cuts

By the fall of 1982, Warner Amex was experiencing significant losses. The eventual loss for 1982 was $47,000,000. The company lost $15,000,000 in 1981. Lockton discussed with Harden proposed cuts in Harden's staff. Although Harden was concerned about these losses and the magnitude of the company's overhead, he protested that the cuts were imprudent and could harm the company. Lockton stated that Warner Amex was prepared to accept the risks presented by the cuts in order to accomplish its cost reduction objective. Commencing in January 1983, cuts resulting in a 40% reduction in Harden's staff from 250 to 150 were implemented. The cuts were not due to disatisfaction with Harden's performance, since cuts were made in other departments. No change in Harden's responsibilities and duties occurred as a result. The Audit Committee instructed Harden to report to it if he found that the staff cuts caused him difficulty in carrying out his responsibilities. Harden never did so.

### Lewis' Employment By Warner Amex

In the fall of 1982, Drew Lewis, then President Reagan's Secretary of Transportation, was approached about assuming the position of Warner Amex Chief Executive Officer. James Robinson, Chairman of American Express, encouraged Lewis to take the job. Robinson was discouraged with the results at Warner Amex and he had lost confidence in Hauser, the company's chief executive.

Lewis' entire business career had centered around turnaround situations, i.e., efforts to resuscitate troubled companies. Because Lewis was concerned that there were two parent companies, he conditioned his accepting the Warner Amex offer on being given the complete authority and responsibility to operate Warner Amex as if it was his own business. Lewis was to have control over personnel decisions such as hiring and firing. The only control to be retained by the parent companies was the right to approve or disapprove capital expenditures. Under these conditions he accepted the position.

Lewis became Chairman and Chief Executive Officer of Warner Amex on February 1, 1983. Lewis and Harden first met at a December 1982 meeting in Philadelphia. Hauser and Lockton also attended. Lewis was more impressed with Harden than with either Hauser or Lockton. Harden reacted positively to Lewis during his initial contacts with him.

### Relationships With Parent Companies And Their Representatives Under Lewis

Harden told Lewis during their initial contacts that he thought it was important for Lewis to take control of the relationships with the parent companies. Lewis agreed. He had become aware that the problems of dealing with two parents put a

burden on many Warner Amex employees. Lewis determined that the company had to stop such interference with its personnel, including Harden, who received more questions from the parents than the others at Warner Amex because he was responsible for the financial information.

Lewis decreed that all communications from the parents had to go through his office. These efforts to insulate Warner Amex personnel from parent company interference were successful. Harden supported these efforts to insulate him and others from parent company interference, since he had more time to do his own work.

In December 1982, Lewis had a discussion relating to Harden with George Sheinberg. Sheinberg told Lewis that he was not certain whether Harden was competent. Lewis replied that he was hired with the authority and responsibility for personnel decisions, that Harden had a key position with the company, and that if Lewis felt that Harden was competent he would have Harden stay. Lewis therefore intended to work with Harden to see if he was capable of doing the job. Sheinberg replied that Lewis should make his own decision. Subsequently, Lewis told Sheinberg that Harden was "doing O.K." Sheinberg acceded to Lewis' evaluation of Harden. Lewis later advised the entire Executive Committee, including Sheinberg, that he was satisfied with Harden's performance, felt that Harden was a great help to him, and that Lewis needed him in the company. Lewis also told Sheinberg that unrealistic projections in the past had not been Harden's fault.

After Lewis arrived, Sheinberg became a non-factor. Lewis did not report to Sheinberg and Sheinberg did not play a role in the company. Sometime between December 1982 and February 1983, Lewis told Harden about the December 1982 conversation with Sheinberg.

*Lewis' Personnel Decisions*

Shortly after he arrived at Warner Amex, Lewis dismissed Lockton and seven vice presidents. In early March of 1983, Lewis hired John Fowler as the company's fourth Executive Vice President. Lewis hired Fowler to act in a general management capacity to help to improve the results of Warner Amex's operations.

Fowler had had a long history of working for Lewis. He first worked for Lewis on Lewis' Pennsylvania gubernatorial campaign in the early 1970's, next at the Reading Railroad where Fowler was Chief Financial Officer, then at Lewis' consulting firm, Lewis and Company, and finally as counsel to Lewis at the Department of Transportation. While still at the Department of Transportation, Lewis told Fowler he would be hired as an Executive Vice President and would be made a Warner Amex director. In April 1983, upon Lewis' recommendation to American Express and Warner Communications, Fowler was appointed to the Executive Committee. Lewis told plaintiff about his prior relationship with Fowler in February 1983, when he also told plaintiff that Fowler would be working closely with Lewis in managing Warner Amex. Fowler received a salary of $150,000 per year upon being hired at Warner Amex, compared to plaintiff's $155,000 annual salary.

*Harden's Attendance At Executive Committee Meetings*

Harden had never served on the Executive Committee, although he had attended the meetings to present financial information and to be available to answer questions. Lewis and Harden discussed Harden's attendance at Executive Committee meetings in the context of Lewis' plans to limit parent company interference in the operations of Warner Amex. When they had first met, Harden had observed that the Executive Committee met with great frequency. Lewis suggested to Harden that he limit his attendance at these meetings to making his financial report and then leaving after his report was complete. The reason for this proposal was to enable the Executive Committee to discuss the overall direction of the company and to avoid spending the entire meeting on financial figures, as had occurred in the past. Harden regarded Lewis' position as being a

reasonable one for him to take. He never complained to Lewis about his changed role at the Executive Committee meetings.

### Fowler's Duties and Responsibilities

Lewis hoped to have Fowler succeed Lockton as President and Chief Operating Officer of the company. Consequently, Lewis gave Fowler special assignments. Fowler was not considered a possible successor to Harden. Lewis felt that Harden was more competent than Fowler in financial matters.

### Relationships With Banks

While Harden worked for Warner Amex, he had the primary responsibility for the Warner Amex banking relationships. This included responsibility for accommodating approximately twenty banks in the restructuring of the revolving loan agreement.

During the spring of 1983, in response to Harden's suggestion, Lewis attended bank meetings to enable the bankers to meet Lewis. Harden ran these meetings and introduced Lewis to the bankers. In April 1983, Lewis informed plaintiff that Harden should invite Fowler to attend future meetings with Warner Amex's commercial bankers in order that Fowler could meet the bankers. This suggestion was made because Fowler was under consideration for the position of President of Warner Amex. It was desirable for him to have some contact with the banks. Pursuant to Lewis' suggestion, Harden introduced Fowler and Lewis to Warner Amex commercial bankers on at least three occasions. On each occasion, Lewis informed the bankers of the history of his relationship with Fowler. Harden never told Lewis that he objected to Fowler's attendance at these bank meetings with him. Other than these three meetings with Warner Amex commercial bankers, there were no other meetings with commercial bankers which Fowler attended while Harden worked at Warner Amex. As part of his efforts to obtain financing for the Milwaukee financing, described below, Fowler held meetings with investment bankers. Plaintiff did not attend these meetings.

### The Milwaukee Franchise Financing

Before Lewis arrived at Warner Amex, Harden was engaged in raising funds for the construction of Warner Amex's Milwaukee cable operations and for increasing the company's bank revolving credit from $500,000,000 to $800,000,000, as required to meet the company's cable franchise construction commitments. In the spring of 1983, Warner Amex considered various methods of arranging for the Milwaukee franchise franchising. In order to avoid taking a $20,000,000 loss, Lewis proposed to do the financing off the balance sheet through a limited partnership. Harden disagreed with this proposal, and felt that he would need further information before he could have proceeded in the manner that Lewis wanted. But, because Lewis was the Chief Executive Officer it was his decision to make.

In April 1983, Lewis decided to assign Fowler the responsibility for the Milwaukee franchise financing. This decision was based upon Fowler's substantial prior experience with limited partnership financing. Lewis announced that Harden would assist Fowler as necessary. In addition, several members of plaintiff's staff were assigned to report directly to Fowler with regard to the Milwaukee financing. For example, Lewis told plaintiff that Jack Dowling, a Vice President responsible for financial analysis who reported to plaintiff, would not have to report to Harden about the work he was performing for the Milwaukee financing. In addition, Lewis assigned to Fowler the responsibility for divesting certain Warner Amex assets. Previously, Harden had been responsible for the financial aspects of such divestitures.

Although Harden was "up to his ears" with other responsibilities, and "had more than he could do in what he was [already] doing," he was concerned when his staff began to question him about what Fowler's assignments meant to his future employment at Warner Amex. During this period, Harden was extremely busy, and had an "awful lot of responsibilities," including trying to get control over the 1983 financial

information, obtaining a substantial increase in the bank loan revolver and completion of an important tax restructuring of the company. None of these responsibilities were taken from Harden. Harden never complained to Lewis that Lewis had given Fowler the Milwaukee responsibilities, other than the fact that he objected to the theory of a limited partnership approach. Eventually, Lewis himself obtained the financing for the Milwaukee franchise from Manufacturers Hanover Bank.

*Harden's Relationship With Lewis*

When Lewis arrived at Warner Amex, Harden accepted the fact that Lewis had the authority to decide whether Harden would remain. Lewis had told Harden that he should look to Lewis for his future with Warner Amex. They worked well together on a day-to-day basis and spent a significant amount of time together. While they had differences of opinion, this was not uncommon for business executives. Except for the times when Lewis was not in town for business reasons, he met with Harden practically every morning.

Harden's responsibilities as Chief Financial Officer under Lewis included responsibility for the company's accounting, the company's relationship with its principal banks and data processing. Harden also continued to be responsible for the preparation of forecasts. Lewis never asked Harden to prepare forecasts on the basis of assumptions which Harden regarded as unreasonable, and no such forecast was ever prepared by Harden for Lewis. Both Harden and Lewis were concerned that some of the past projections had been overly optimistic. Lewis told Harden that all forecasts should be realistic and that he did not want any negative surprises.

Lewis and Harden agreed that the company's overhead was excessive, that certain management functions were being duplicated by the New York headquarters and the field operations offices. Significant overhead reductions were necessary. Lewis accepted Harden's recommendations with respect to staffing in Harden's department.

Thus, when McKinsey & Co., a consulting firm, recommended that fourteen persons be cut from Harden's department, Harden voiced his objection to Lewis and only three employees were actually cut. As a result of the McKinsey & Co. recommendation, several hundred Warner Amex personnel were cut throughout the company. Much greater cuts were made in departments other than Harden's since Harden had already made a number of reductions before Lewis arrived. Harden spoke with some pride of the fact that he had made cuts in his department and felt that he had done what he should and others had not.

Since 1981, problems had existed with respect to accounts receivable at WASEC. At an April 1983 board of directors' meeting, Bert Wasserman expressed concern about this problem. Harden suggested to Lewis that an additional 35 to 40 persons be hired and advised that this staff should be regarded as a potential permanent addition. Lewis accepted this recommendation and authorized employment of the personnel recommended by Harden.

Lewis never told Harden that he was dissatisfied with Harden's performance. On more than one occasion Lewis told Harden that he was doing a fine job. He also told Harden that he should not be concerned about his relationships with the parent companies and the Executive Committee members. In late April or early May of 1983, Lewis told Harden that he could remain as Chief Financial Officer of Warner Amex, that they were getting the job done, and that Lewis saw no reason to make any change.

*Harden's Decision to Leave Warner Amex*

On June 24, 1983, during the late afternoon, Harden met with Lewis for approximately fifteen minutes. Harden told Lewis that from Harden's perspective, there was no long-term future for him at Warner Amex. Harden told Lewis that it had become apparent to him that he was not supported by the Executive Committee membership, some of whom had openly expressed displeasure with him. Furthermore, it appeared unlikely that he would

ever receive additional responsibilities in the company. Under these circumstances, he felt it was inappropriate for him to continue to work at Warner Amex. Harden had joined the company with the expectation of a long-term arrangement but it had not worked out that way. In addition, Harden stated that he had long wanted to go into business for himself. The time had come for him to leave.

At this time, Harden had many responsibilities. He was still responsible for the company's books and records and tax returns, data processing and information systems, and for administering the existing bank revolver. A new loan was being contemplated. He still had responsibility for the Warner Amex treasury, and except for the Milwaukee project, previously described, still reported to management on the results of operations.

During the June 24, 1983 meeting, Lewis stated that he was satisfied with Harden's performance. Lewis wanted Harden to reconsider his decision to leave the company. Lewis emphasized that he was in a terrible fix and needed Harden, who was "hard-nosed" on important matters such as expense control. Harden stated that he would reconsider, but that probably he would not change his mind. Lewis conceded, however, that if Harden was unhappy at Warner Amex, it was inappropriate for him to stay. Such a circumstance had occurred to Lewis earlier in his career and he stated that if Harden truly felt that way, he should not stay. Nevertheless, Lewis expressed his hope that Harden would stay so they could continue to work together.

At the conclusion of the meeting, Lewis remarked to his secretary, Judy Waltos, that he was disappointed and that Warner Amex was "in trouble" because Harden intended to leave.

A second meeting took place on Monday, June 27, 1983. Harden reported that he had thought about his decision over the weekend but had not changed his mind. Lewis again urged Harden to reconsider and stated that he thought it was a mistake for him to leave. Following this meeting, Lewis discussed his disappointment and concern about Harden's departure with Fowler. Lewis told Fowler that there was no one under Harden who Lewis felt was competent to replace him. Lewis discussed the possibility of calling Harden's wife in the hope that she might be able to persuade Harden not to leave. Lewis never did so upon the advice of his own wife, as well as Fowler, that it would be inappropriate to take such a step. Lewis discussed his disappointment with his administrative assistant Judy Swantak and Jack Schneider, the WASEC President. Lewis asked for Schneider's assistance in persuading Harden to stay, since they had worked closely together on the WASEC receivables problem.

A third meeting between Harden and Lewis took place on Wednesday, June 29 or Thursday June 30, 1983. Harden reaffirmed his decision to leave. At this meeting, Lewis stated that he understood plaintiff's feelings, and that he had done the best he could to keep Harden at Warner Amex. He also told Harden that Lewis had done the same thing in 1969 and that he had been on his own ever since. Lewis stated that Harden should leave if that is what he wished.

Lewis then stated that he wanted to announce Harden's departure the following Monday at the Operations Committee meeting. Lewis asked if Harden would stay until a replacement could be found. Harden agreed. According to Harden, they agreed that his leaving should be termed a resignation so that the bankers should not be concerned. However, Lewis claims that there was no discussion about Harden's departure being considered a resignation. At Monday's Operations Committee meeting, Lewis reported that Harden wanted to do some other things and was going to leave, but had agreed to stay until a replacement could be found. Lewis thereafter reported to the Executive Committee that Harden had decided to leave, that his leaving was a loss and that Lewis regretted it.

*Discussion Of Severance Benefits*

At this time, Harden informed Lewis of his employment agreement with Warner Amex which Harden claimed entitled him to certain benefits upon termination of his employment. Lewis obtained a copy of the Agreement from the personnel department. In early July 1983, Lewis and Harden had certain discussions regarding plaintiff's severance benefits. Lewis told Harden that he would make a recommendation to the Executive Committee based upon the Agreement with respect to severance benefits and would report the results of that meeting to Harden. Lewis later told plaintiff that the Executive Committee opposed giving Harden any severance benefits, that they opposed the continuation of plaintiff's employment, did not support Harden, and were not disposed to approve any payment to him.

*Harden's Interest In Other Business Opportunities*

Harden had long been interested in going into business for himself, even before the time he joined Reliance. In late June or early July of 1983, Harden began discussions with several individuals about possibly forming a group that would offer to buy the WASEC subsidiary of Warner Amex. Harden told this group that in his opinion, this presented an attractive opportunity since he knew that Warner Amex was attempting to divest a portion of WASEC. It appeared that there might be an opportunity to purchase the entire WASEC operation. This group discussed the financing of the purchase and that Harden would be the senior operating manager and have an equity participation in the form of common stock ownership. In late June of 1983, Harden had his first discussion with Lewis concerning the possible purchase of WASEC. Harden spent several evenings and weekends preparing a written proposal with respect to such a purchase. This proposal was presented to Lewis in July. Lewis thereafter presented it to the Executive Committee. He thereafter advised Harden that it had been rejected. On August 20, 1983, Harden presented the matter directly to Sandy Weil, President of American Express, at Weil's home in Greenwich, Connecticut.

*Harden's Departure From Warner Amex*

On Monday, August 22, 1983, Lewis came to Harden's office and told him that because of Harden's conversation with Weil, it was appropriate for plaintiff to leave as quickly as possible. He wanted Harden to vacate his office and the building no later than Friday of that week. Harden left Warner Amex at the end of that week, August 26, 1983. Plaintiff did not submit a written resignation to Warner Amex.

*Replacement Of Harden*

Before he joined Warner Amex, Lewis knew Jack Messman, whom he had first met in 1971. Messman had run Norcross Cards for Lewis, so Lewis knew of his executive abilities, which were primarily in the financial area. Lewis spoke to Messman in December of 1982 and told him that Lewis was going to work at Warner Amex. Lewis stated that he was not certain if Warner Amex had the operating management to run the company. He wanted to know Messman's status if and when he should need him. Messman told Lewis that he was happy where he was, but that if an opportunity existed in the role of Chief Operating Officer or Chief Executive Officer, Messman would be interested.

Lewis met with Messman on February 15, 1983 and March 22, 1983. Both meetings were initiated by Messman. Messman expressed an interest in joining Warner Amex in the event there was an open position, but Messman was not interested in the position of Chief Financial Officer. Lewis told him that there were no openings for someone of Messman's qualifications and that he was satisfied with the management he had. Lewis had a brief conversation with Messman at the Harvard Business School on June 4, 1983, where Lewis was being honored as the school's alumnus of the year. Lewis again indicated that he was satisfied with things and that there was no opening for Messman.

After the June 24, 1983 conversation with Harden, Lewis asked David Horowitz and Lou Gerstner of American Express if there was anyone they wanted to replace Harden. Lewis did not contact any recruitment firm, or interview any candidates. In early July 1983, he called Messman and asked him to take Harden's job. Messman had earlier told Lewis that his current employer was in the process of filing a public registration statement with the SEC and that Messman was identified in the statement as a member of the company's management. As a consequence he could not leave the company in July without disrupting the registration process, which would be completed in mid-August.

Messman came to New York on July 7, 1983. Lewis told him that Harden had resigned and that Lewis was looking for a Chief Financial Officer to replace him. Messman met with Harden to discuss the job. Harden told Messman that he had resigned from Warner Amex because he had long wanted to go into business for himself and that Harden thought the time had come to make the move. Messman eventually agreed to accept the job, and commenced work on Monday August 29, 1983.

### CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter and the parties to this action. 28 U.S.C. § 1332. The law of the State of New York is determinative of the issues in this action.

*Parol Evidence*

■ The parol evidence rule does not bar parol testimony with regard to plaintiff's rights under the Agreement for the following reasons. Ambiguity in certain aspects of the Agreement renders parol evidence admissible to resolve such ambiguities. *See 67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 248–49, 371 N.Y.S.2d 915, 918, 333 N.E.2d 184, 186 (1975); *Croce v. Kurnit*, 737 F.2d 229, 235 (2d Cir.1984). Parol evidence is also admissible to determine the intent of the parties so that the Agreement may be interpreted

to fulfill its purpose. *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075 (1982). Furthermore, the Agreement is not fully integrated. By its very terms the Agreement is an "outline" of a "gentleman's understanding" including certain oral representations made to plaintiff. It does not contain a merger clause. The Agreement also incorporates all other Warner Amex benefits which were provided to its employees. Finally, since the Agreement was drafted by Warner Amex, any ambiguities must be resolved in plaintiff's favor. *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 348, 126 N.E.2d 271, 273 (1955); *Tougher Heating & Plumbing Co. v. State of New York*, 73 A.D.2d 732, 423 N.Y.S.2d 289, 291 (3d Dep't 1979).

*Mutually Acceptable Termination*

■ The parties agreed that a mutually acceptable termination, including a decision by either plaintiff or Warner Amex that plaintiff's employment at Warner Amex was not proceeding as hoped, would be considered a termination of employment by the company. This circumstance entitles plaintiff to receive the benefits set forth in the Agreement in the event of a termination by the company. Plaintiff's departure from Warner Amex constituted a mutually acceptable termination, therefore entitling plaintiff to recover the benefits due under the Agreement in the event of termination by the company.

During the course of the June 24, 1983 discussions, Lewis acknowledged Harden's unhappiness. Based upon his own experience, Lewis suggested that if Harden was unhappy and wished to set off on his own he should do so. This agreement to disagree constitutes a "mutually acceptable termination," one of the situations covered by Harden, Lockton and Davatzes during their discussions. Furthermore, once he learned of the Agreement, Lewis exercised the discretion reserved by Lockton to determine "unilaterally" whether Harden should receive severance benefits, and made a recommendation to the Board of Directors

that Harden should receive such benefits. Accordingly, Harden's leaving was a "mutually accepted departure," which, under the Agreement, was a termination by the company.

*Constructive Discharge*

■ A constructive discharge constitutes a termination of employment by the company. Harden has failed to prove that he was constructively discharged by Warner Amex. To establish such a discharge, a plaintiff must show that there was a material change in his duties or a significant reduction in rank. *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 40, 280 N.E.2d 867, 872 (1972). Harden has not established that there was a material change in his duties or a significant reduction in his rank. He held the title and performed the duties of Executive Vice President and Chief Financial Officer of Warner Amex until he departed. The staff cuts under Lockton were motivated by valid business reasons and did not cause any change or reduction in Harden's responsibilities or rank. Under Lewis, *increases* in Harden's staff took place. The limitation on Harden's attendance at Executive Committee meetings was a reasonable action for Lewis to take; indeed, one with which Harden agreed. Throughout his employment at Warner Amex, Harden continued to have primary responsibility for dealing with the banks.

The assignment of responsibilities for financing the Milwaukee franchise was attributable to Harden's heavy responsibilities in other areas, Fowler's prior experience with limited partnerships, and Harden's disagreement with Lewis's proposal. Harden was not stripped of his authority or relegated to an inferior job. *See Karas v. H.R. Laboratories, Inc.*, 271 A.D. 530, 534, 67 N.Y.S.2d 15, 18 (2d Dep't 1946), *aff'd*, 297 N.Y. 494, 74 N.E.2d 192 (1947). Harden's position as Chief Financial Officer remained unchanged "in the things that determined its identity," and his "place within the class [was] retained." *Marks v. Cowdin*, 226 N.Y. 138, 146–47, 123 N.E. 139, 141–42 (1919).

## DAMAGES

Plaintiff is entitled to recover damages in the amounts set forth below.

■ *Salary Continuation:* When Harden left Warner Amex, his salary was $155,000 per annum. The continuation of such salary for a period of nine months would have entailed a total payment of $116,250.

■ *Pension Benefits:* The value of the pension to which Harden would have been entitled under paragraph 4 of the Agreement, if his employment had been "terminated by the company" on August 31, 1983, would have been $66,209.68. This figure is calculated according to the following method.

Harden's "final average pay" under the qualified pension plan, and after application of the $125,000 per year presumption set forth in paragraph 4 of the Agreement, would be $131,999.99. This figure derives from the average of $125,000 for year one; $140,000 for year two; $103,333.33, or two-thirds of $155,000, for the first eight months of year three (January 1, 1983 to August 31, 1983); $41,666.66, or one-third of $125,000, for the last four months of year three; and $125,000 for each of years four and five.

According to § 4.01(b)(a)(A) of the Warner Cable Pension Plan ("Plan"), plaintiff's annual pension would be computed as follows. Final average pay in the amount of $131,999.99 is reduced by $6,600, with $125,399.99 remaining. Multiplied by 1.5%, this equals $1,880.99. Next, $66 is added to this number, producing $1,946.99. According to Davatzes, the Warner Amex plan has a one year waiting period which counts for vesting but not for benefit service. *See* Plan § 3.03(c). Thus, under paragraph 4 of the Agreement, Harden was to receive 15 years of vesting service credit which provides 14 years of benefit service credit. The next step is to multiply $1,880.99 by 14, which provides for an annual pension of $27,257.99, commencing at age 65.

As of August 31, 1983 Harden, who was born on October 2, 1937, had reached the age of 45 years and 11 completed months. In order to calculate the present value of the pension rights as of August 31, 1983, the following calculations must be performed. First, using the conversion table used by Warner Amex (Pl. Ex. 11), and computing on a ten year certain annuity basis, the annual pension amount of $27,257.99 would, for a person of such age, be multiplied by 2.429. The product of this multiplication equals $66,209.68. This number represents the present value of the pension rights as of August 31, 1983.

■ Income tax factors should not be taken into account in computing the value of plaintiff's pension benefits. New York law does not consider income taxes in computing damages. *Vasina v. Grumman Corp.*, 492 F.Supp. 943, 944–45 (E.D.N.Y. 1980), *aff'd*, 644 F.2d 112, 118 (2d Cir.1981). There is no reference in the Agreement to tax considerations, nor is there any such reference in the employee handbook discussing benefits. Harden did not discuss tax aspects of the pension benefits with Warner Amex representatives. Moreover, had Harden received a pension beginning at age 65, it would have been fully taxable as ordinary income, like other payments from a qualified, non-contributory plan. 26 U.S.C. §§ 402(a) & 403(a); Treas.Regs. §§ 1.61–11(a); 1.72–4(d)(1).

*Accrued Bonus:* Plaintiff is entitled to accrued 1983 bonus for the following reasons. An enforceable agreement existed based upon the offer and acceptance of the yearly bonus payment as part of plaintiff's compensation package. *Willoughby Camera Stores, Inc. v. Commissioner*, 125 F.2d 607, 608 (2d Cir.1942); *H.S. Kerbaugh, Inc. v. Gray*, 212 F. 716 (2d Cir.1914); *Westinghouse v. Carlton*, 202 F. 129 (2d Cir.1913); Annot., 43 A.L.R.3d 503 (1972). The bonus was an integral part of plaintiff's compensation package. Paragraph 2 of the Agreement clearly defined compensation in terms of base salary and bonus. Both base salary and bonus were to increase in future years, with the extent of any increase dependent upon plaintiff's and Warner Amex's performance. The bonus payment does not constitute termination benefits or salary continuation. It is compensation for services already performed.

All performance requirements were satisfied by plaintiff. His base salary and bonus increased throughout the time he was employed by Warner Amex. Lewis testified that he was satisfied with plaintiff's performance on the job. Except in the event of "dire circumstances," plaintiff had been told that he would receive a bonus payment annually. It is true that Warner Amex experienced hard times while plaintiff worked there. But, the $15,000,000 loss for 1981 did not preclude payment of a $75,000 bonus to plaintiff for that year, in excess of the $65,000 set forth in Paragraph 2 of the Agreement. Nor did the $42,000,000 loss for 1982 deprive plaintiff of a $100,000 bonus for that calendar year. Furthermore, there is no evidence that the bonus payment was contingent on employment for the entire calendar year. *Cf. Brydges v. Coast Wide Land, Inc.*, 2 Wash.App. 223, 467 P.2d 209, 212 (1970).

■ Where the precise amount is to be determined at a later time, a mutually agreeable termination does not deprive a plaintiff of accrued compensation such as the bonus in this case. *See* Annot., 28 A.L.R. 346, 346 (1924); *Scheuer v. Monash*, 40 Misc. 668, 83 N.Y.S. 253, 254–55 (Sup.Ct. App.T. 1st Dep't 1903).

> [A]ssuming that there is a valid and enforceable promise through the offer of a bonus and acceptance by the employee's continuing in the service, if the employment is terminated by mutual consent of the parties or by the act of the employer through no fault of the employee, the latter should be entitled to a proportionate share of the bonus, according to the time served, even though there was no time fixed for the duration of the employment, and it could, therefore, be terminated at will.

Annot., 28 A.L.R. 346, 346 (1924); *see also Willoughby Camera Store*, 125 F.2d at 608, *citing* 28 A.L.R. 346. The Agreement

does not set forth the precise amount for the 1983 bonus other than to state that the amount of bonus will increase in future years. Under New York law, in interpreting employment contracts which, as here, include open additional compensation clauses, the court may determine an appropriate bonus. *Knapp v. McFarland,* 344 F.Supp. 601, 612 (S.D.N.Y.1971), *modified and remanded on other grounds,* 457 F.2d 881 (2d Cir.), *cert. denied,* 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92 (1972). Under paragraph 4 of the Agreement, and based upon plaintiff's salary and bonus history, plaintiff's $15,000 1983 base salary increase would have been accompanied by a $25,000 bonus increase to $125,000. Two-thirds of that sum, representing the amount of bonus that had accrued by the time he left at the end of August, 1983, equals the sum of $83,333.33. This sum represents the amount of bonus plaintiff had earned as of the time that he departed Warner Amex.

 *Vacation:* The Warner Amex vacation policy provides two weeks of vacation annually during the first five years of employment. The accumulation of vacation time from year to year is not allowed. Harden was employed by Warner Amex for two years and six months. He took two and one-half weeks of vacation while with Warner Amex. Harden never sought payment for any vacation time not taken. Harden is not entitled to be compensated for this unused, accrued vacation time.

*Insurance And Medical Coverage:* Under the Agreement, plaintiff was entitled to insurance and medical coverage for the nine-month period through May 1984 following his departure from Warner Amex. Lockton and Davatzes agreed with plaintiff before execution of the Agreement that plaintiff's life, accident and health insurance benefits would be continued and paid for by Warner Amex for nine months following the termination of plaintiff's employment. Warner Amex did not continue to provide life, accident, death and medical coverage for plaintiff after August 1983. The reasonable cost of providing this coverage is $4,200.

## CONCLUSION

As a result of plaintiff's termination of employment at Warner Amex through a "mutually acceptable termination," plaintiff is entitled to judgment in the amount of $269,993.01 with interest at the legal rate from December 16, 1983. This damage award is broken down as follows:

(1) Nine months' salary continuation in the amount of $116,250;

(2) A pension in the amount of $27,257.99 commencing at age 65, payable in a lump sum distribution as of September 1, 1983 in the amount of $66,209.68;

(3) Accrued bonus for the eight months worked from January 1983 through August 1983 in the amount of $83,333.33; and

(4) The cost of nine months' medical and life insurance coverage in the reasonable sum of $4,200.

The Court having hereby rendered its findings of fact and conclusions of law, the Clerk of the Court is directed to enter judgment in favor of plaintiff in the amount of $269,993.01, with interest at the legal rate from December 16, 1983.

SO ORDERED.