Richard D. THOMSON, Plaintiff,

v.

SAATCHI & SAATCHI HOLDINGS (USA), INC., Saatchi Advertising, Inc., Rumrill–Hoyt, Inc., Saatchi & Saatchi Cash Balance, Rumrill–Royt Supplemental Plan, Richard O'Brien, Robert Kennedy, Defendants.

No. 93–CV–6284L.

United States District Court,
W.D. New York.

March 31, 1997.

Maureen T. Alston, Paul W. Holloway, Harter, Secrest & Emery, Rochester, NY, for plaintiff.

Seamus M. Tuohey, Grotta, Glassman & Hoffman, New York, NY, Margaret M. Madden, Grotta, Glassman & Hoffman, Roseland, NJ, John B. Grant, Camhy, Karlinsky & Stein, New York, NY, Robert N. Eccles, O'Melveny & Meyers, LLP, Washington, DC, for Saatchi & Saatchi Holdings (USA), Inc., Saatchi Advertising, Inc., Rumrill-Hoyt, Inc.,

Saatchi & Saatchi Cash Balance, Rumrill-Hoyt Supplemental Plan, Richard O'Brien and Robert Kennedy.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Richard D. Thomson, commenced this action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff, a former Chairman and Chief Executive Officer ("CEO") of defendant Rumrill–Hoyt, Inc. ("Rumrill"), alleges that defendants terminated his employment on account of his age, and that they wrongly denied him certain pension benefits. Plaintiff also asserts a cause of action under the New York Human Rights Law ("HRL"), N.Y. Exec. L. § 296 *et seq.*, as well as common law claims for breach of contract. Plaintiff seeks declaratory and injunctive relief, as well as money damages.

Defendants have moved for summary judgment on all of plaintiff's claims. Plaintiff has moved for summary judgment on Claim I of the complaint, which alleges a violation of § 404 of ERISA, 29 U.S.C. § 1104.

## FACTUAL BACKGROUND

Plaintiff alleges that in 1981, after being laid off from an executive position with an advertising agency, he began looking for new employment. Around the beginning of 1982, he was contacted by someone from Rumrill, which at the time was seeking to recruit a Director of Client Services and Business Development. Rumrill is an advertising agency headquartered in Rochester, New York. In 1982, Rumrill was a wholly-owned subsidiary of Compton Communications, Inc. ("Compton").

Thomson and Rumrill negotiated about Thomson's possible employment for some time. Among the subjects that they discussed was the pension benefits Thomson would receive. On March 16, 1982, Joseph Valerio, who was then Rumrill's Executive Vice President and General Manager, sent Thomson two letters. The first offered Thomson the position of Senior Vice President and Director of Client Services and Business Development. The second letter described the compensation package being offered to Thomson. Among other things, the second letter stated the following:

*Compton Pension Plan:*

★ Employees who meet the requirements for years of service and age are eligible for pensions based on the average of their salaries paid for five consecutive years of employment prior to retirement. Normal retirement benefits, when combined with Social Security, are equal to approximately half of that average salary. The company pays the entire cost of the benefits you will receive from the Pension Plan.

Thomson Affidavit Ex. 2.

In fact, however, the Compton Pension Plan nowhere provided that employees' combined retirement and Social Security benefits would equal half of their average salary. It appears that Valerio may have based this statement on a similar statement in a preexisting recruitment brochure; *see* Thomson Affidavit Ex. 4. Defendants contend that the statement in the brochure was a "garbled version" of a benefit that had been applied to certain employees employed on December 31, 1975. In any event, it is clear that under the terms of the Compton Pension Plan, Thomson was not entitled to benefits at that high a level, and that Valerio's statement to the contrary was incorrect.

On March 18, 1982, plaintiff sent Valerio a responding letter. Thomson stated that while the compensation package was "attractive," there were "some areas of both major and minor concern." Thomson Deposition Ex. 11. The "major concerns" related principally to Thomson's salary. Among the "minor concerns," Thomson stated: "Under the pension provision is a statement about 'employees who meet requirements'. What are the requirements that have to be met?" *Id.* This was the only statement in the letter relating to pension benefits.

On March 26, 1982, Valerio sent Thomson a response. He stated that Rumfill had decided to offer Thomson "an increased compensation package," which included a signing bonus and a higher base salary. Thomson

Deposition Ex. 12. Valerio stated that Rumrill was offering "a pension plan that can be a major building block in your long-range thinking," but he did not repeat his prior statement that Thomson's pension plus Social Security would total about half of Thomson's salary. An attachment to the letter, however, provided a breakdown of the compensation package. Under the heading "Pension Plan," the document stated the following:

|  | Annual Annuity Payable Immediately | Annual Annuity Deferred to Age 60 | Personal Savings Required to Purchase Annuity* |
|---|---|---|---|
| Age 50 | — | 3,851 | |
| 55 | 10,428 | 15,404 | |
| 60 | 23,106 | 23,106 | $7,027 |

*The amount of annual savings needed to purchase annuity, assuming 10% interest, 50% tax rate, salary on Page 1 [$83,000] and purchase of annuity at age 60.

$7,027 Annual Payment Required × 2 Tax Effect = $14,545 Salary Equivalent $14,550

---

Around the beginning of April 1982, Thomson accepted Rurrill's offer. Valerio confirmed this in a letter to Thomson dated April 5, 1982. Among other things, the letter stated: "To sum up what we have agreed on: a) Your compensation package is as stated in my letter to you of March 26, 1982 ..." Thomson Deposition Ex. 13.

Several months after Thomson was hired, Rumrill's parent, Compton, was acquired by Saatchi & Saatchi Advertising Affiliates Holdings, Inc., a wholly-owned subsidiary of Saatchi & Saatchi PLC ("PLC"), a corporation headquartered in Great Britain.

In October 1985, Thomson became Rumrill's President and CEO. He also became Rumrill's Chairman around October 1987.

On July 30, 1987, Kurt Minwell, Rumrill's Executive Vice President, Finance, wrote a memorandum to Thomson stating that he had "reviewed the status of pension as it relates to the '50% of average last 5 years salary including social security' provision." Thomson Affidavit Ex. 6. Minwell stated that this "pension statement does not work for the people on schedule (B)," which was an attachment to the memo. Thomson was among the persons listed on schedule B. Minwell suggested that this "problem" could be corrected by Rumrill purchasing an annuity or by "making an adjustment to the pension plan ..." *Id.*

Beginning sometime in 1987, Thomson began negotiating a new employment agreement with Rumfill. Plaintiff was represented by an attorney during the negotiations. The final agreement, which was signed by Thomson and Minwell on April 1, 1988, stated at paragraph 4.7 that Thomson had

been a participant in the employee benefit plans of Saatchi & Saatchi Compton, Inc., ("SSCI"), [Rumfill's] former parent. Effective October 1, 1987, new employee benefit plans of the Saatchi & Saatchi Communications Group (the "S & S Group") were substituted for the SSCI employee benefit plans. Upon retirement, [Thomson] shall receive the greater of (a) the benefits to which he is entitled under the Cash Balance Plan [the new plan] ... or (b) the benefits to which he would have been entitled under the SSCI Pension Plan. For purposes of this section, the "SSCI Pension Plan" shall mean the defined benefit pension plan of SSCI in effect on September 30, 1987.

Thomson Deposition Ex. 32. Paragraph 11 stated, "This Agreement supersedes and terminates all prior agreements between the parties relating to the subject matter herein addressed except where noted in subparagraph 4.7."

The Cash Balance Plan that was adopted on October 1, 1987 contained certain provisions defining the accrued benefit for participants who had been members of a predecessor plan, such as the Compton Pension Plan. The Cash Balance Plan stated that the accrued benefit for a participant who had been a member of a predecessor plan as of Sep-

tember 30, 1987 would be not less than the greater of: the actuarial equivalent of the accrued benefit to which the participant would have been entitled under the provisions of the predecessor plan as of September 30, 1987; or the actuarial equivalent of the accrued benefit to which the participant would have been entitled under the provisions of the predecessor plan as if the predecessor plan had continued in effect, less the actuarial equivalent of that portion of the participant's employer contribution account under the Saatchi & Saatchi Profit Sharing Plan which was attributable to employer basic contributions under that plan.

Thomson was not the only Rumrill employee who had been told when he started his employment that his pension benefits plus Social Security would equal about half his previous salary. In 1989, therefore, certain persons within Rumrill began looking into the extent of the shortfall between what was promised and what the plan would actually pay, as well as the cost of making up the difference. Nothing concrete was done about the matter until 1990, however, when Nicholas Orloff, who had also been hired by Rumrill during the 1980s, began considering retirement. Orloff asked Rumrill for information about the amount of his pension benefit. When he reviewed the information, he realized that the amount was lower than what his employment letter had indicated it would be.

Thomson, Orloff, and some Saatchi & Saatchi executives met to discuss the matter. Eventually, in September 1990, the parties reached an agreement whereby Orloff ceased working for Rumrill after December 31, 1990, but remained on the payroll as an active employee, receiving an annual salary of $146,000 in 1991, $80,000 in 1992, and $50,000 in 1993 and in 1994, plus full benefits.

At around the time of the Orloff settlement, however, Martin Tucker, an attorney employed by one of Saatchi & Saatchi's subsidiaries, told plaintiff not to expect to receive a deal similar to Orloff's. Tucker told Thomson that Thomson's 1988 contract precluded him from receiving the benefit promised by Valerio. Plaintiff claims that he was surprised by Tucker's statement because plaintiff believed that his 1988 contract specifically preserved the promised benefit.

Plaintiff then began making efforts to get his pension situation straightened out, and particularly to ensure that he would receive the amount promised him by Valerio. In 1991, Thomson spoke with defendants Richard O'Brien, and Robert Kennedy, who were respectively the Vice Chairman and Chief Financial Officer of Saatchi & Saatchi Advertising Worldwide, Inc. ("Worldwide"), the corporation to which Rurrill reported. O'Brien told plaintiff that he had talked to Kennedy, and that they did not think plaintiff would have the same problem as Orloff.

Kennedy in turn conferred with Joseph Sanseverino, who was the Director of Employee Benefits for Saatchi & Saatchi. In August 1991, Sanseverino asked the pension actuaries to perform an actuarial calculation of the pension benefits described in plaintiff's March 16, 1982 employment letter. They informed him that, depending on the method by which Thomson's benefit were calculated, the "promised" benefit exceeded the plan benefit by about $3000 to $7300 per month. The lump sum equivalent of the shortfall at Thomson's age 60 would range from about $362,800 to $877,500, and the annual cost to find the shortfall beginning on September 1, 1991 ranged from over $60,000 to nearly $150,000.

After reviewing these calculations with Sanseverino, Kennedy told plaintiff in August 1991 that the promises made to him at the time of his hire would be honored. At Kennedy's direction, Sanseverino also provided plaintiff with a memorandum estimating what Thomson's benefits would be under the terms of the March 16, 1982 letter. Sanseverino, however, used the lower of the two sets of figures provided by the actuaries. The reason for the different figures is that the Cash Balance Plan incorporates Tax Code § 401(a)(17), which provides that in calculating benefits, a participant's compensation in excess of $200,000 shall not be taken into account. This section became effective as of October 1, 1988. The two sets of figures, then, result from calculating Thomson's benefits both with and without the salary cap. One of plaintiff's claims in

the instant case is that this salary cap should not have been applied to his benefits. Plaintiff alleges that Sanseverino should have informed him that his projected benefits had been calculated with this salary cap in place.

Defendants allegedly did take some steps to make up the shortfall so that they would be able to pay plaintiff the promised benefits. In August 1991, Kennedy allegedly directed that Rumrill should begin to accrue funds in its annual budgets to enable it to make up the shortfall by the time Thomson reached age 60. Budgets which were drafted prior to Thomson's termination did include an accrual of such funds, although ultimately these budgets were not adopted.

On January 28, 1992, plaintiff attended a meeting with O'Brien, Minwell, and another Saatchi & Saatchi executive to discuss the 1992 budget and some other matters for the year ahead. Various items were discussed at the meeting, but plaintiff alleges that the subject of his performance was never mentioned.

On January 30, 1992, plaintiff received by fax from a Saatchi & Saatchi attorney a copy of a letter from O'Brien to Thomson stating that plaintiff was being terminated due to the "fundamental difference that exist[ed] between [Thomson's] view of how Rumrill–Hoyt should be managed and [Worldwide's vision]." Thomson Affidavit Ex. 47. Plaintiff called O'Brien, who said the termination was due to a dispute that plaintiff and O'Brien had had at the January 28 meeting about merging a certain Saatchi & Saatchi subsidiary into Rumrill.

Plaintiff alleges that he was immediately replaced by a 46–year–old man. Plaintiff admits that he received the severance benefits due him under his employment contract, see Thomson Deposition at 714, but he did not immediately receive pension benefits. Although Thomson requested a lump-sum payment of pension benefits, defendants were unwilling to do so unless Thomson would acknowledge that the lump sum represented all the benefits that he was entitled to under the Cash Balance Plan. In April 1994, however, when plaintiff needed capital to finance a certain business transaction, he again contacted defendants about a lump-sum payment. He sent defendants the acknowledgment form they had given him, from which he had stricken the following sentence: "I understand that the receipt of a lump sum represents payment in full of all my benefits accrued under the Plan." Defendants refused to accept this limited acknowledgment, so Thomson signed and sent them an unaltered form. Thomson Affidavit Ex. 49. He then received a lump-sum distribution of about $475,000.

## PLAINTIFF'S CLAIMS

Plaintiff commenced the instant action on June 17, 1993. Defendants. include Saatchi & Saatchi Holdings (USA), Inc. ("Holdings"), Saatchi & Saatchi North America, Inc. ("S & SNA"),[1] Rumrill, the Saatchi & Saatchi Cash Balance Retirement Plan ("the Cash Balance Plan"), the Rumrill–Hoyt Supplemental Plan ("the Supplemental Plan," which defendants deny exists), O'Brien and Kennedy.

Claim I is brought against Holdings, S & SNA, Rumrill, and the Supplemental Plan for benefits allegedly due to plaintiff under the terms of the so-called Supplemental Plan. According to plaintiff, the alleged promise in Valerio's letter that Thomson's pension and Social Security benefits would equal roughly half his salary, combined with defendants' subsequent conduct, gave rise to what plaintiff calls the "Supplemental Plan," meaning that it supplements the benefits available under the Compton Pension Plan. Defendants deny that any Supplemental Plan exists. They contend that Valerio simply misstated the terms of the Compton Pension Plan.

In Claim II, which is brought against Holdings, S & SNA and the Cash Balance Plan, plaintiff seeks payment of benefits under the Cash Balance Plan without regard to the salary caps mandated by Tax Code § 401(a)(17) as a condition of maintaining the plan's tax-exempt status.

---

1. Plaintiff does not appear to dispute defendants' contention that S & SNA is mistakenly named in the complaint as Saatchi & Saatchi Advertising, Inc.

Claim III asserts that S & SNA and Rumrill terminated plaintiff's employment in order to interfere with his right to pension benefits in violation of 29 U.S.C. § 1140.

Claims IV and V allege that Holdings, S & SNA, O'Brien and Kennedy terminated him on account of his age in violation of the ADEA and HRL.

Claims VI and VII, both of which are premised upon New York law, allege that defendants breached their contractual obligation to pay him a bonus of $101,000 for fiscal year 1991.

Plaintiff alleges that although he was entitled to this bonus, defendants refused to pay it on the ground that plaintiff was no longer an employee on the date bonuses were distributed. Plaintiff claims that there was no policy prohibiting the payment of a bonus under the circumstances here. Claim VI is based on defendants' alleged promises to plaintiff that he would receive a bonus, and Claim VII is based on plaintiff's employment contract.[2]

## DISCUSSION

### I. The "Supplemental Plan"

■ Although it is clear that there was never any formal plan officially named the "Supplemental Plan," plaintiff alleges that defendants in effect created such a plan through their words and actions. The term "Supplemental Plan" is plaintiff's designation of this alleged plan.

Plaintiff asserts that three events in particular combined to create a Supplemental Plan. The first is the March 16, 1982 letter to plaintiff from Valerio containing the "approximately half of that average salary" language. The second and third are defendants' calculation in 1991 of what Thomson's benefits would be under the terms of Valerio's letter, and Kennedy's subsequent instructions to provide funding in the budget to provide Thomson with the promised benefits.

In support of his contention that these events created the alleged Supplemental

Plan, plaintiff relies principally upon *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir. 1982), in which the Eleventh Circuit established a test for determining when a plan is covered by ERISA.

[A] welfare plan requires (1) a "plan, find, or program" (2) established or maintained (3) by an employer or an employee organization, or both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

*Id.* at 1371.

*Donovan* has since been cited with approval by the Second Circuit in *Grimo v. Blue Cross/Blue Shield, of Vermont*, 34 F.3d 148 (2d Cir.1994), in which the court quoted the statement in *Donovan* that

a "plan, fluid, or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.... However, the "plan, find, or program" need not be a formal written document. In fact, "[s]ome essentials of a plan, fund or program can be adopted, explicitly or implicitly, from sources outside the plan, fired, or program ..."

*Id.* at 151 (quoting *Donovan*, 688 F.2d at 1373; other citations omitted). *See also Grimo v. Blue Cross and Blue Shield of Vermont*, 899 F.Supp. 196, 201 n. 4 (D.Vt.1995) (*Donovan* "formulated the 'prevailing standard'" for determining whether plan exists).

Applying this standard to the case at bar, I find that the undisputed facts show that the so-called Supplemental Plan does not exist. The evidence shows only that Valerio erred in describing the amount of the benefits available under the Compton Pension Plan. The fact that defendants may have taken some steps toward trying to provide plaintiff

---

**2.** Plaintiff has voluntarily withdrawn Claim VIII, which alleged that defendants' refusal to pay him

a bonus violated of the New York Labor Law.

with benefits of the type described by Valerio does not show that any additional plan was ever created.

First, the March 16, 1982 letter from Valerio clearly did not set up a plan. Valerio simply described in general what he (mistakenly) believed, that "normal" retirement benefits were "approximately" equal to for qualifying employees. This broad, general statement did not specify any of the criteria necessary for establishing an ERISA plan. *See Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1480 (4th Cir.) (representations about disability benefits made in employment offer letter did not constitute a plan under test set forth in *Donovan*), *cert. denied,* — U.S. ——, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996).

Furthermore, the record shows that Thomson himself did not believe that this letter sufficiently described his pension benefits, for in his March 18 letter to Valerio, Thomson asked, "What are the requirements that have to be met [to receive pension benefits]?" His March 18 letter also made clear that Thomson was not prepared to accept Rumrill's offer of employment. When he finally did accept, the terms of Thomson's employment were set out in the April 5, 1982 letter from Valerio to Thomson, which did not contain any statement that Thomson's pension and Social Security benefits would equal half his average salary.

Another important reason that plaintiff cannot assert that his 1982 employment contract included benefits under the "Supplemental Plan" is that plaintiff's 1988 contract with Saatchi & Saatchi, which expressly superseded all prior agreements, contained no half-of-salary promises, and made clear that Thomson's benefits were limited to the greater of his benefits under the Cash Balance Plan or under the SSCI Pension Plan; there was never any mention of a third, "supplemental" plan. Plaintiff's contention that such a plan exists, then, is directly refuted by his 1988 contract. Plaintiff may have misunderstood what the amount of his benefits would be under the SSCI Plan, but there is no evidence that he was led to believe that he would receive any benefits in addition to those under the SSCI Plan.

Defendants' subsequent actions also did not create a "Supplemental Plan." For one thing, no concrete steps ever were taken to provide Thomson with additional benefits; though some tentative actions were taken, no system was ever put in place, nor were any funds actually set aside, for this purpose. Thus, the alleged Supplemental Plan was never "established or maintained" as required for ERISA coverage. 29 U.S.C. § 1003(a). Even if at some point defendants intended to see to it that Thomson received the benefits promised by Valerio, that is not enough to create a plan. "A decision to extend benefits is not the establishment of a plan or program....[I]t is the reality of a plan, find or program and not the decision to extend certain benefits that is determinative." *Donovan,* 688 F.2d at 1373.

Several courts have reached similar results in analogous circumstances. In *Stiltner,* 74 F.3d 1473, the defendant employer had sent the plaintiff a written offer of employment that listed among the plaintiff's employment benefits medical insurance and long-term disability benefits. The letter failed to mention, however, that there was an exclusion for preexisting medical conditions. The plaintiff, who had a heart condition, suffered a heart attack after he began working for the defendant, and his application for benefits was denied under the exclusion. Affirming summary judgment in favor of the employer, the Fourth Circuit held that the "offer letter could not be enforced as an informal ERISA plan, because it did not meet the four requirements for a plan set forth in *Donovan* ..." *Id.* at 1479. In particular, the court noted, the offer letter "d[id] not show the source of the funding for the benefits described, and it d[id] not indicate the procedure by which an employee can apply for and receive benefits." *Id.* at 1480 n. 7.

In *Elmore v. Cone Mills Corp.,* 23 F.3d 855 (4th Cir.1994), a group of managers gained control of the defendant company through a leveraged buyout ("LBO"). Prior to the LBO's approval by the shareholders, the managers stated in a letter to the company's salaried employees that the company had overfinded the existing retirement plan, and that if the LBO was successful, the managers

would contribute the surplus funds to the employee stock ownership plan ("ESOP"). The LBO was approved, but a group of employees subsequently sued, alleging that the company had not contributed the entire surplus to the ESOP. Reversing the district court's findings that the representation in the letter to the employees concerning the surplus informally became part of the ESOP, and that the defendants breached their fiduciary duties under ERISA by failing to live up to their promise, the Fourth Circuit stated that to be covered by ERISA, an "informal plan must ... actually be in existence; the mere decision to create an employee benefit plan is not actionable." *Id.* at 861. The court noted that the letter did not qualify as a plan under the criteria set forth in *Donovan* because it did not explain the procedure for receiving benefits. *Id.* at 862.

In *Watkins v. Westinghouse Hanford Co.,* 12 F.3d 1517 (9th Cir.1993), the plaintiff had worked from 1974 until 1988 at the same government-owned nuclear plant. Because the government used different contractors, however, plaintiff had worked for one company (WHC) from 1974 to 1981, and for another company (Rockwell), from 1981 to 1987. In 1987, the government consolidated all the plant's operations with WHC, and from then until his retirement in 1988, the plaintiff worked for WHC. In 1987, when considering whether to take early retirement, the plaintiff requested a calculation of his pension benefits, particularly whether his initial service with WHC and his service with Rockwell would be credited for vesting and benefit-computation purposes. At the time of his request, WHC was in the process of creating a new pension plan. WHC informed the plaintiff in two separate letters that all his prior service would be recognized. The new plan was adopted on December 30, 1987, and plaintiff retired on January 1, 1988. After the plaintiff retired, the plaintiff initially received the promised benefits, but the plan's administrative committee subsequently determined that the plan's provisions recognized prior service only with the employer for whom the employee worked immediately prior to the 1987 consolidation. Plaintiff was then informed that his benefits had been erroneously calculated, and would be reduced

accordingly. Affirming the district court's dismissal of the plaintiff's ERISA claim, the Ninth Circuit noted that the two letters telling the plaintiff what his benefits would be did not create an ERISA plan because they "contain[ed] none of the details about beneficiaries, source of financing, or procedures for paying and administering benefits that are necessary to create an ERISA plan." *Id.* at 1523 (footnote omitted). The court added that "the fact that the letters were mistaken cannot on that account alone create an ERISA plan. Otherwise, every communication about prospective benefits could create a unique plan for a single participant who is not differently situated from fellow employees for whom the plan is established." *Id.*

The same considerations apply in the instant case. From the documents relied upon by plaintiff, no one could reasonably ascertain such critical elements as the source of funding or the procedure for receiving benefits. Although some funding proposals may have been considered, none was ever adopted, and no funds were ever put in place to pay the "Supplemental Plan" benefits. Nor was any method created for determining when the benefits would vest, or how and when they would be paid. In fact, the settlement with Orloff, which plaintiff cites as evidence that a Supplemental Plan existed, indicates that there was no clear method of paying the benefits. Instead of simply increasing Orloff's pension benefits, defendants kept him on the payroll for several years after he ceased working. This ad hoc method, which was adopted in order to settle a dispute with one particular employee, suggests that defendants had no general approach to handling such claims. In short, the alleged Supplemental Plan has never existed, and plaintiff's claim for benefits under that plan must be dismissed.

## II. Calculation of Benefits Using Salary Cap

As stated, the Cash Balance Plan incorporates Tax Code § 401(a)(17), which provides that a pension plan will not qualify for tax-exempt status "unless ... the annual compensation of each employee taken into account under the plan for any year does not

exceed $200,000." This section also provides that the $200,000 figure is to be adjusted annually to reflect increases in the cost of living.

Although plaintiff made in excess of $200,000 in the relevant years, then, his benefits were calculated based on a lower amount. Plaintiff's actual compensation during the period in question ranged from $213,000 to $293,000, but the compensation that was taken into account for purposes of calculating his benefits ranged from $200,000 to $228,860.

Plaintiff contends that the imposition of this salary cap violated the terms of the Cash Balance Plan, which contains a "grandfathering" provision stating that employees who had previously been participants in predecessor plans would, at retirement, receive the greater of their benefits under the Cash Balance Plan or the prior plan had the prior plan not been eliminated. The Cash Balance Plan Summary also stated that benefits under the prior plan would be calculated as if the prior plan "had continued in effect unchanged, except as required by law." Plaintiff contends that since the Compton Pension Plan did not contain the $200,000 salary cap, he is entitled to have his benefits calculated under that plan without the cap.

Plaintiff's argument is flawed in several respects, however. To understand why, it is necessary to be aware of the sequence of events which led to the adoption of the salary cap. When the Compton Pension Plan was replaced by the Cash Balance Plan in 1987, the Cash Balance Plan did not contain a salary cap. In 1989, however, Tax Code § 401(a)(17) took effect, providing that to qualify for tax-exempt status, a plan must be written so that in computing employees' benefits, any salary in excess of $200,000 is not to be considered. *See* 26 C.F.R. § 1.401(a)(17)-l(d)(1)(i). The Cash Balance Plan was then amended to include such a provision.

This is not a situation, then, in which the drafters of the Cash Balance Plan simply decided at the outset to use a salary cap that had not been present in the Compton Pension Plan; the imposition of the cap was a result of new legislation that could not have

been foreseen when the Cash Balance Plan was adopted in 1987.

As noted, the Cash Balance Plan provided that benefits under the prior plan would be calculated as if the prior plan "had continued in effect unchanged, except as required by law." Plaintiff's argument that the salary cap is not literally *required* by law is specious and based on a hypertechnical reading of the word "required." It is true that a plan could legally have existed without the salary cap (and therefore without a tax exemption), but it is obvious that had the Compton Pension Plan continued in existence, it too would have been amended to incorporate the salary cap so as to maintain its tax-exempt status. That the preservation of the plan's tax exemption was an important concern to the drafters of the Compton Pension Plan is apparent from the terms of the plan itself; for example, § 9.1 of the Compton Pension Plan states that "any amendment [of the plan] may be retroactive to the extent necessary to preserve the qualified tax-exempt status of the Plan." Section 11.7 also states that Section 11 (titled "Top–Heavy Provisions") was

> intended to conform the Plan to the requirements of Section 416 of the [Tax] Code and any regulations, rulings or other pronouncements issued pursuant thereto, and shall be construed accordingly. In the event that under any statute, regulation or ruling all or a portion of the conditions of this Section are no longer required for the Plan to comply with the requirements of Section 401 (or any other provisions with respect to qualification for tax exemption of retirement plans and trusts) of the Code, to the extent possible such conditions shall become void and shall no longer apply without the necessity of an amendment to the Plan.

It is clear, then, that the 1989 change in the tax laws effectively required the use of the salary cap, which would have necessitated an amendment of the Compton Pension Plan had it existed at that time.

It should also be noted that Claim II is not brought to enforce plaintiff's rights under the Compton Pension Plan; indeed, it could not

be, since that plan no longer exists. Rather, this claim is brought under the Cash Balance Plan, which clearly provides that the salary cap must be used when calculating benefits, so as to preserve the plan's tax exemption. It is true that the Cash Balance Plan indirectly implicates that Compton Pension Plan through the grandfathering clause. The fact remains, however, that plaintiff's benefits, regardless of how they are *calculated,* are actually *paid* by the Cash Balance Plan. To disregard the Cash Balance Plan's salary cap provision through the fiction that benefits are being calculated as if the Compton Pension Plan still existed would mean that, contrary to the requirements of the Tax Code, salary in excess of the statutory amount was in fact taken into account in calculating Thomson's benefits. Such a course of action could therefore result in the plan losing its tax-exempt status, to the detriment of the plan as a whole and all its participants. I conclude, then, that defendants' calculation of plaintiffs benefits using the salary cap was entirely proper. Claim II must therefore be dismissed.

### III. Interference with ERISA Rights

In Claim III, plaintiff alleges that defendants wrongfully discharged him because of his efforts to obtain the benefits promised to him by Valerio. By doing so, plaintiff alleges, defendants violated 29 U.S.C. § 1140, which makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 *et seq.],* or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan this subchapter, or the Welfare and Pension Plans Disclosure Act." Both sides have moved for summary judgment on this claim.

This claim is subject to analysis under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111–15 (2d Cir.1988). Under this approach, plaintiff must first establish a prima facie case "by showing that the plaintiff (1) belongs to a protected group, (2) was qualified for the position, and (3) was discharged or denied employment under circumstances that give rise to an inference of discrimination." *Id.* at 1114–15. If plaintiff succeeds in making out a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. If defendant carries that burden, plaintiff must show that the legitimate reason proffered by defendant is a mere pretext for discrimination. *Id.* at 1111.

Applying these standards to the case at bar, I find that plaintiff has failed to make out a prima facie case because, on the facts alleged, plaintiff has not shown that he is a member of a protected group for purposes of § 1140. First, plaintiff has not shown the existence of a genuine issue of material fact regarding his allegation that he was terminated because he had exercised any right to which he was entitled under a benefit plan or under ERISA itself. Plaintiff's contention that he "was exercising his rights as a participant in the Supplemental Plan when he was terminated," see Plaintiff's Memorandum of Law at 23, fails for the simple reason that, as explained previously, the Supplemental Plan has never existed. Likewise, the facts do not support plaintiff's assertion that he was exercising his right under ERISA to obtain plan information. Although plaintiff correctly cites this court's prior decision in *Roeder v. General Signal Corp.,* 901 F.Supp. 124 (W.D.N.Y.1995), for the proposition that § 1140 prohibits an employer from discharging an employee because the employee requested information required to be provided to him under 29 U.S.C. § 1025(a), that case is distinguishable from the case it bar. In *Roeder,* the plaintiff had requested a calculation of what his benefits would be based on several different potential retirement dates. There was no dispute in *Roeder,* however, that the plan in question did exist and that the plaintiff was covered under the plan. The plaintiff in

*Roeder* alleged that his employer had terminated him because the employer inferred from his request that he was planning to retire before a certain project that he was working on would be completed. In contrast, it is clear that at the time of Thomson's termination, Thomson had long since realized that the Cash Balance Plan would not provide him with the level of benefits that he had expected; it was that realization that precipitated the entire dispute between him and defendants. Rather than requesting information about his rights under the Cash Balance Plan, then, Thomson was simply trying to persuade defendants to find some means *outside* the Cash Balance Plan to provide him with an additional benefit so that the total level of his benefits would be consistent with Valerio's statements to him in 1982. Those discussions between plaintiff and defendants thus did not relate directly to any ERISA plan, and were not protected by ERISA.

■ Plaintiff also cannot show that defendants terminated him in order to interfere with his attainment of rights under an ERISA-covered plan. To establish this, plaintiff would have to show that he had "an opportunity to attain rights in a covered benefit plan ..." *Id.* at 1115. In a general sense, plaintiff clearly falls within that category of employees. Since § 1140 is concerned with interference with pension rights, however, the rights allegedly interfered with must be the same rights that plaintiff had "an opportunity to attain" for purposes of establishing the first element of his prima facie case.

This is precisely why plaintiff's § 1140 claim fails. Claim III is based upon the allegation that "defendants wrongfully discharged plaintiff based upon and as a result of his efforts to secure the benefits promised him and due to him under the Supplemental Plan." Complaint ¶ 68. Since no Supplemental Plan ever existed, however, plaintiff in fact had no rights under that alleged plan. There were no benefits "due to him." Thus, defendants' actions, regardless of their motivation, cannot give rise to a claim under § 1140 based upon plaintiff's allegations.

■ Moreover, even if plaintiff did have some rights under the "Supplemental Plan," there is no evidence that defendants terminated plaintiff in order to interfere with those rights. The evidence shows simply that defendants had no intention of giving plaintiff the benefits he sought. That was true regardless of whether plaintiff was employed by defendants or not. Under no reasonable view of the evidence could it be found that defendants terminated plaintiff in order to prevent him from *attaining* benefits. *Cf. Dister*, 859 F.2d at 1115 (plaintiff's discharge about four months before benefit rights were to vest gave rise to inference of discrimination).

In addition, although the complaint does not expressly allege that defendants interfered with plaintiff's rights under the Cash Balance Plan (as opposed to the Supplemental Plan), any loss of benefits in that regard (in the sense that plaintiff might have earned a higher salary in future years had he not been terminated, and thus would have been entitled to a higher level of benefits) was merely incidental to his termination. *See Clapp v. Greene*, 743 F.Supp. 273, 276 (S.D.N.Y.1990) (no ERISA claim where termination prevented plaintiff from continuing to enroll in firm's pension benefit and health and medical plans), *aff'd*, 930 F.2d 912 (2d Cir.), *cert. denied*, 502 U.S. 868, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991); *Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 232 (S.D.N.Y.1989) (no ERISA claim where employee's termination prevented him from accruing additional benefits in fully vested pension plan); *see also Dister, supra*, at 1111 (plaintiff must show more than "lost opportunity to accrue additional benefits").

## IV. Age Discrimination Claims

■ In Claims IV and V, which are based respectively upon the ADEA and the HRL, plaintiff alleges that defendants terminated him because of his age. These claims, like the ERISA discrimination claim, are subject to the *McDonnell Douglas* burden-shifting analysis.

It is clear that plaintiff has made out the first three elements of a prima facie case of age discrimination. He was born on January

31, 1936, and was notified of his termination on January 30, 1992, a day before his fifty-sixth birthday, so he falls within the protected class. Although there is some dispute about whether he was qualified for his position, the fact that he was CEO for over six years supports an inference that he was qualified. There is no also dispute that plaintiff was discharged.

Whether plaintiff has shown the fourth element—circumstances giving rise to an inference of age discrimination—is questionable. Since defendants have proffered legitimate, nondiscriminatory reasons for plaintiff's discharge, however, I will assume that plaintiff has made out a prima facie case and proceed to the ultimate issue, which is whether plaintiff has shown issues of fact concerning whether defendants' proffered reasons are a pretext for age discrimination. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all it needs to decide whether 'the defendant intentionally discriminated against the plaintiff'") (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct., at 1093).

As stated, defendants have articulated legitimate, nondiscriminatory reasons for plaintiff's discharge. Defendants contend that there were significant differences between plaintiff and senior management concerning Rumrill's budgets and other matters, that plaintiff did not get along with his colleagues and subordinates, and that O'Brien had received complaints about plaintiff's personality from one of defendants' largest clients.

As evidence of pretext, plaintiff relies upon several facts and allegations. First, he alleges that his termination came without warning and that defendants had never previously said anything to him about his alleged performance deficiencies. He contends that all the justifications offered by defendants for his termination were devised after the fact.

He also asserts that defendants have given inconsistent reasons for his termination.

Plaintiff also alleges that in September 1991, plaintiff asked Kennedy about the status of Al Wegener, who was at the time about 60 years old and was the CEO of one of Saatchi & Saatchi's subsidiaries, which was about to be merged with Rumrill. Plaintiff states that "Kennedy responded that he was going to get rid of the old guy because he was over the hill." Thomson Affidavit ¶ 70. Wegener was allegedly asked to step down as CEO shortly thereafter. He took a consulting job with Saatchi & Saatchi, from which he was fired within a year. *Id.* ¶ 71.

Plaintiff also alleges that between 1990 and 1994, nine out of fourteen CEOs within Saatchi & Saatchi were replaced by younger persons. He also claims that a chart produced by defendants containing information about senior management changes in Saatchi & Saatchi companies under Kennedy's control from 1990 to 1994 "discloses a pattern of replacing older executives with younger ones." *Id.* ¶ 73.

Viewing this evidence in the light most favorable to plaintiff, I find that he has failed to show the existence of any issues of fact concerning whether defendants' proffered reasons are a pretext for age discrimination. Defendants are therefore entitled to summary judgment on Claims IV and V.

First, plaintiff's allegations that he was performing his job satisfactorily and that defendants never mentioned his alleged deficiencies until after his termination is not in itself probative of age discrimination. Such evidence might tend to put at issue what the real reason for plaintiff's termination actually was, but it does not tend to show discriminatory animus unless coupled with other evidence that age was a factor. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 110 (2d Cir.1994) (to survive summary judgment in ADEA case, plaintiff must produce sufficient evidence to support finding that employer's proffered reasons are false, *and* that "more likely than not the employee's age was the real reason for the discharge"); *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 261 n. 3 (1st Cir.1994) (factfinder's disbelief of employer's proffered reason, without some evi-

dence of age discrimination, would not support finding of discrimination).

■ As stated, plaintiff contends that defendants have offered inconsistent reasons for their actions. I recognize that such inconsistencies may under some circumstances support a finding of pretext. *See, e.g., EEOC v. Ethan Allen,* 44 F.3d 116 (2d Cir.1994) (employer changed proffered reason for plaintiff's termination only after state investigative agency discovered evidence that initially proffered reason was false); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir.1994) (evidence would support inference of discrimination where "questions and inconsistencies abound[ed]" concerning reason for plaintiff's termination). A close examination of the record, however, reveals that plaintiff's contention that defendants' statements have been inconsistent is based largely on statements taken out of context, and on inapt comparisons between different statements.

For example, plaintiff notes that in O'Brien's January 29, 1992 letter to him, O'Brien stated that he was "struck by the fundamental difference that exist[ed] between [Thomson's] view of how Rumrill–Hoyt should be managed for the future and ours." However, plaintiff states, in a telephone call in February 1992 O'Brien told Thomson that he was fired because he had resisted the merger of a certain Saatchi & Saatchi subsidiary with Rumrill.

Contrary to plaintiffs assertion, there is no inconsistency between those two statements. The broad differences between plaintiff and O'Brien over Rumfill would naturally encompass disagreements over particular matters, such as the merger.

In addition, plaintiff states that Kennedy insisted at his deposition that resistance to the merger was not a reason for plaintiff's termination. In fact, however, all Kennedy said was that he had no knowledge about O'Brien telling Thomson that the merger issue was the reason for his termination, and that from *Kennedy's* point of view, that was not the reason. Kennedy Depo. at 134. The fact that Kennedy and O'Brien may have had different reasons for supporting Thomson's termination, however, does not amount to an inconsistency.

Plaintiff also asserts that although defendants allege that he was terminated because of various performance problems, when he took steps in late January 1992 to address those problems, defendants dismissed his efforts as "throwing in the towel." Again, that is not an inconsistency. O'Brien simply stated at his deposition that although Thomson had sent him a memo after the January 28, 1992 meeting that indicated to O'Brien that Thomson at last realized the seriousness of O'Brien's concerns about certain matters; the tone of the memo also suggested to O'Brien that Thomson simply wanted O'Brien to tell him what to do about Rumrill's problems, rather than take an active role himself in addressing the problems. O'Brien stated that "[t]hat is not the posture that you want a chief executive of one of your principal subsidiaries to take." O'Brien Depo. at 431–32. The fact that O'Brien believed that Thomson recognized the existence of certain problems, then, is not inconsistent with O'Brien's statement that he was dissatisfied with Thomson's response to those problems.

Plaintiff also states that Minwell testified that plaintiff's bonus was withheld in 1991 because plaintiff was terminated "for cause," but that in their Statement of Undisputed Material Facts in support of their motion for summary judgment, defendants admitted that Thomson was not discharged for cause. What Minwell said, however, was that he did not know why Thomson did not receive his bonus, that it was not his decision, and that he *assumed* that it was because Thomson was terminated for cause. Minwell Depo. at 1034–35.

In addition, in regard to his assertion that defendants admitted that plaintiff was not discharged for cause, plaintiff references ¶ 212 of defendants' Statement of Undisputed Material Facts. *See* Thomson Affidavit ¶ 115; Plaintiff's Memorandum of Law at 37. Paragraph 212, however, says nothing about a bonus or termination for cause, and even if it did, it could not be considered inconsistent with Kennedy's testimony, since Kennedy did not claim to know why plaintiff did not receive a bonus for 1992.

Plaintiff's allegations concerning other CEOs are also not suggestive of discrimination in his case. While plaintiff characterizes this as "statistical evidence," it is of little if any probative value. For one thing, the numbers of people involved are so small that it is doubtful if any meaningful conclusions could be drawn from this evidence. The replacement of nine out of fourteen CEOs from 1990 to 1994 is simply not probative. *See Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333–34, 39 L.Ed.2d 630 (1974) (statistics regarding racial composition of thirteen-member school board nominating panel were meaningless); *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1268 (10th Cir.1988) (sample sizes ranging from two to twenty-four people were too small to produce meaningful use of statistics); *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984) (ten terminations over eleven-year period too small to permit inference of discrimination); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383 (11th Cir.) (affirming summary judgment for defendant in ADEA case, citing lack of probative value of plaintiff's statistics due to small sample size), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983).

In addition, the record shows that at least some of the nine CEOs who were replaced left their employment voluntarily, and there is no evidence that they were coerced into retirement. Plaintiff identifies three CEOs who were terminated, but aside from the fact that they were replaced by younger persons, the evidence does not indicate that their age was a factor. Plaintiff asserts that O'Brien testified that two of the CEOs, Joe Mack and Peter Green, were terminated because of their "resistance to the 1992 budget process," which is similar to one of the reasons given by defendants for Thomson's discharge. The fact remains, however, that nothing about O'Brien's statement is suggestive of age discrimination. Likewise, O'Brien's statement that Gale Johnson, a Senior Vice President at Rumrill, was terminated because he "was not bringing ... state-of-the-art expertise in public relations" is far too little to suggest that Johnson's age was a factor in his termination, much less to show that *Thomson* was a victim of age discrimination. *Cf. Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (solitary remark by plaintiff's supervisor that he "needed younger blood" was insufficient to preclude summary judgment for defendant in ADEA case); *Martin v. Ryder Distribution Resources, Inc.*, 811 F.Supp. 658, 661, 664 (S.D.Fla.1992) (alleged statement of employer's chief operating officer referred to group of age-protected executives as "good old boys" and "old-fashioned" did not relate to executives' age, and did not preclude summary judgment for employer), *aff'd*, 16 F.3d 1232 (11th Cir.1994).

The only evidence of discriminatory animus, then, is Kennedy's alleged statement referring to Wegener that Kennedy was going to "get rid of the old guy because he was over the hill." If Kennedy had made that statement about *Thomson*, that evidence might well preclude summary judgment. Likewise, if there were evidence that Kennedy had on various occasions made similar remarks about other employees, or if there were some other evidence indicating that he harbored such views about older employees in general, summary judgment might be inappropriate. Standing alone, however, this single stray remark is simply not suggestive that Thomson's age was a factor in his termination.

## V. Claims Relating to 1991 Bonus

In Claims VI and VII, plaintiff alleges that defendants have breached their contractual obligations by refusing to pay him a bonus of approximately $101,000 that he claims was owing to him at the time of his termination. Claim VI alleges that plaintiff is entitled to the bonus pursuant to defendants' alleged promises to him that he would receive a bonus, and Claim VII alleges that plaintiff is entitled to the bonus pursuant to his written employment contract.

New York has a "long standing policy against the forfeiture of earned wages ..." *Weiner v. Diebold Group, Inc.*, 173 A.D.2d 166, 167, 568 N.Y.S.2d 959 (1st Dep't 1991). In furtherance of that policy, New York courts have held that "[e]mployees in this State may enforce an agreement to pay

an annual bonus made at the onset of the employment relationship where such bonus constitutes 'an integral part of plaintiff's compensation package.'" ' *Mirchel v. RMJ Securities Corp.*, 205 A.D.2d 388, 390, 613 N.Y.S.2d 876 (1st Dep't 1994) (quoting *Harden v. Warner Amex Cable Communications*, 642 F.Supp. 1080, 1096 (S.D.N.Y. 1986)). Put another way, "[w]here a bonus constitutes a term of employment and 'there exists a reasonable basis for calculating the bonus due an employee, a court may enforce the contract term." ' *Canet v. Gooch Ware Travelstead*, 917 F.Supp. 969, 985 (E.D.N.Y. 1996) (quoting *Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494, 508 (S.D.N.Y.1989)).

 Nevertheless, for an employee to have an enforceable right to a bonus, the bonus must constitute an "earned" payment. *Id.* The reason for this is that "[a]t common law, 'a corporation' proposing to give a sum for the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become vested and absolute." ' *Hall v. United Parcel Serv.*, 76 N.Y.2d 27, 36–37, 556 N.Y.S.2d 21, 555 N.E.2d 273 (1990) (quoting *McNevin v. Solvay Process Co.*, 32 A.D. 610, 612, 53 N.Y.S. 98 (1898), aff'd, 167 N.Y. 530, 60 N.E. 1115 (1901)). A promise to pay a bonus is unenforceable, then, if the written terms of the bonus plan make clear that the employer has "absolute discretion" in deciding whether to grant or pay a bonus. *Canet*, 917 F.Supp. at 985. Whether unpaid compensation constitutes a discretionary bonus or nonforfeitable earned wages is a question of fact. *Mirchel*, 205 A.D.2d at 389, 613 N.Y.S.2d 876.

 In making this determination, the overriding principle is that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." *Hall*, 76 N.Y.2d at 36, 556 N.Y.S.2d 21, 555 N.E.2d 273 (citation omitted). A bonus plan need not be set forth in any particular form of document; in *Hall*, for example, the employer's plan was described in an informal memorandum to upper-level managers. *Id.* at 37, 556 N.Y.S.2d 21, 555 N.E.2d 273.

In the case at bar, Thomson's receipt of bonuses was governed by his 1988 employ-ment agreement. Section 4.2 of the agreement states that Thomson "shall receive such Salary increases and bonuses, if any, as may, from time to time, be approved by the management of Saatchi & Saatchi Advertising Affiliates (USA) . . ." Thomson Affidavit Ex. 7. Defendants contend that this provision makes clear that bonus payments were left to the management's unfettered discretion, and that Thomson therefore had no right to a bonus.

In response, plaintiff asserts that there are issues of fact regarding this matter. He notes that his employment contract also stated that if plaintiff were terminated, he would not receive any bonuses "except as had been earned but not paid at termination." Plaintiff contends that this provision suggests that bonuses were not purely discretionary, but could be "earned." He also maintains that the parties' course of dealing, in which he and other Rumrill executives consistently received bonuses if Rumrill met specific profit targets, as well as defendants' alleged assurances to plaintiff as late as January 28, 1991, that the 1991 bonuses would be distributed, obligated defendants to pay plaintiff a bonus.

Viewing the evidence in the light most favorable to plaintiff, the record shows that during Thomson's tenure as CEO, a bonus pool amount was agreed upon during negotiations for the upcoming fiscal year's budget. This pool was based upon Rumrill's profits in excess of a previously-set profit target. It was Thomson's responsibility to make recommendations on the apportionment of the pool among various Rumrill executives based upon their individual performances. Those recommendations were then subject to review and approval by the division to which Rumrill reported, although in general Thomson's calculations were accepted. Thomson Depo. at 738–40; Minwell Depo. at 441–42.

During the negotiations for the 1992 budget, it was agreed that Rumrill's bonus pool from 1991 amounted to $550 million. Thomson Affidavit Ex. 36. In January 1992, Thomson completed his calculations of indi-

vidual bonuses. He set his own bonus at $101,000. Thomson Affidavit Ex. 69, 70.

At the time of his termination, however, Thomson had not yet submitted the bonus recommendations to Worldwide, which was then the division to which Rumrill reported. Subsequent to Thomson's termination, Minwell submitted bonus recommendations to Worldwide. Plaintiff alleges that aside from some "minor" alterations, these recommendations mostly followed Thomson's proposed allocations. ¶ 113.

Worldwide approved the recommendations, and bonuses were distributed in April 1992. Thomson's successor, Tim Cronin, received a bonus of $100,000. Thomson was not awarded any bonus.

Based on these facts, I find that, with respect to Claim VII relating to plaintiff's employment contract, plaintiff has succeeded in showing the existence of a genuine issue of material fact concerning his entitlement to a bonus for 1991. In particular, Thomson's employment contract is ambiguous concerning whether at the time of his termination he had "earned" a bonus that was supposed to be paid to him.

■■■ In a breach of contract action, if the contract is found to be ambiguous, summary judgment is improper. See Curry Road Ltd. v. K Mart Corp., 893 F.2d 509, 512 (2d Cir.1990); Walk–In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 264 (2d Cir.1987); Heyman v. Commerce & Industry Ins. Co., 524 F.2d 1317, 1320 (2d Cir.1975). Whether or not a contract term is ambiguous is a threshold issue for the court. See Walk–In Medical Centers, 818 F.2d at 263. The Second Circuit has described an ambiguous term as

> one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

Curry Road, Ltd., 893 F.2d at 511 (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y.1968)).

In the case at bar, plaintiff's employment contract is ambiguous with respect to what constitutes an "earned" bonus which plaintiff would be entitled to receive in the event of his termination. In particular, it is unclear whether any part of the bonus pool for 1991 had been "earned" by Thomson at the time of his termination. It is undisputed that a certain pool of bonus money had been approved, and that this pool resulted from Rumrill's achievement of its financial goals for 1991, during Thomson's tenure as CEO. There is also evidence in the record that defendants had usually accepted Thomson's recommendations, and that individual employees' bonuses were based in part on their own performances over the course of the fiscal year. This course of dealing, while not conclusive, could be considered by a factfinder as some indication that the parties construed Thomson's employment contract to mean that he would be entitled to a bonus if Rumrill reached its financial target, and if his own performance had contributed to that of Rumrill. See Reichenheim v. Sotheby's, Inc., No. 91 CIV. 5787, 1993 WL 330462 *5 (S.D.N.Y. Aug.24, 1993) (dispute over parties' prior course of dealing precluded summary judgment for employer on employee's contract claim for alleged breach of commission agreement); Emons Indus., Inc. v. Liberty Mut. Ins. Co., 749 F.Supp. 1289, 1296 (S.D.N.Y.1990) (parties' course of dealing in prior years supported plaintiffs interpretation of contract); Travellers Int'l AG v. Trans World Airlines, Inc., 722 F.Supp. 1087, 1102 (S.D.N.Y.1989) (in construing meaning that parties attached to clause in contract, court was guided by course of dealing between the parties); Restatement (Second) of Contract § 223(2) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement"). In short, defendants' contention that bonuses were not considered to have been earned until they were finally approved by Worldwide, while not unreasonable, is not the only construction of the employment agreement that a rational factfinder could reach.

■■■ It should also be noted that the contract was drafted by defendants. To the

extent that the contract is ambiguous, therefore, the court must apply "the well-established rule that contractual ambiguities should be construed most strongly against the drafter ..." *Leninger v. Gibbs & Hill, Inc.*, 730 F.2d 903, 905 (2d Cir.1984) (district court erred in granting summary judgment for employer in wrongful-discharge action, since employment contract was ambiguous regarding circumstances under which employee could be discharged).

With respect to Claim VI, however, I find that defendants are entitled to summary judgment. This claim is not based on the employment contract itself, but on defendants' alleged promises to plaintiff that he would receive annual bonuses, and specifically that he would receive a bonus for fiscal year 1991.

While the allegations of Claim VI in the complaint appear to allege only an oral contract to pay plaintiff a bonus, plaintiff now also contends that those allegations state a claim based on a theory of implied contract. Regardless of the theory under which this claim is analyzed, however, this claim cannot stand. Section 10 of plaintiff's written employment contract states that "[t]his Agreement contains the entire agreement between the parties.... It may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought." Plaintiff's attempt to assert a claim based on an oral or implied contract clearly runs afoul of this provision.

Plaintiff's argument that the contract's prohibition of unwritten modifications did not preclude the parties from entering into a separate oral contract is clearly foreclosed by the contract's express statement that it "contains the *entire* agreement between the parties ..." In short, the case at bar falls squarely within the principle that "[a]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan," *Hall,* 76 N.Y.2d at 36, 556 N.Y.S.2d 21, 555 N.E.2d 273 (citation omitted), which in this case was set forth in plaintiff's written employment contract. That contract simply did not allow the parties to enter into any other oral or implied contracts concerning Thomson's entitlement to a bonus. This case is therefore distinguishable from *Mirchel,* 205 A.D.2d 388, 613 N.Y.S.2d 876, which plaintiff relies upon, since there is no indication from the court's decision in that case that there was any provision in the plaintiff's employment contract proscribing unwritten modifications or additions to the contract.

Plaintiff's contention that he was recruited partly upon the assurance of bonus payments is also of no consequence, given the provision in his 1988 employment contract that it "supersedes and terminates *all prior agreements* between the parties relating to the subject matter herein addressed ..." (emphasis added). By agreeing to that provision, Thomson clearly acknowledged that any rights he may have had to bonuses were governed solely by the 1988 agreement, and any prior agreements were no longer in effect.

## VI. Claims Against Holdings

Defendants contend that all the claims against Holdings should be dismissed because it is not a proper defendant. Defendants assert that Holdings' only function is to provide centralized services to PLC's components in the United States, and that it has never had any discretionary authority with regard to any benefit plans, or any decision-making authority over the day-to-day business operations of any of the companies it serves. In addition, defendants contend that Holdings was not a parent of Rumrill, that there was no interrelation of operations or central management between it and Rumrill, and that it had no control over plaintiff's hiring, dismissal, or other aspects of his employment except with respect to tax, treasury, or legal matters.

In response, plaintiff asserts that there are genuine issues of material fact that preclude dismissal of the claims against Holdings. Virtually all of plaintiff's allegations about Holdings' role in the events underlying this suit, however, concern plaintiff's pension benefits and termination. Those events relate to plaintiff's ERISA and discrimination claims, which have been dismissed, so it is unneces-

828

sary for me to decide whether Holdings is a proper defendant as to those claims.

■ Plaintiff has not presented any evidence to show that Holdings could be held liable on Claim VII, the sole remaining claim. Plaintiff's employment contract was not with Holdings, but with Rumrill. Furthermore, plaintiff has not contravened defendants' assertion that Holdings played no role whatsoever in the decision not to give Thomson a bonus for fiscal year 1991. Holdings is therefore entitled to summary judgment on Claim VII.

## CONCLUSION

Plaintiffs motion for partial summary judgment (Item 45) is denied. Defendants' motion for summary judgment (Item 37) is granted in part and denied in part. Defendants' motion is granted as to Claims I, II, III, IV, V, VI, and VIII. Defendants' motion for summary judgment dismissing Claim VII is granted as to defendant Saatchi & Saatchi Holdings (USA) Inc. In all other respects, defendants' motion is denied.

IT IS SO ORDERED.